ZOLLIE ARLINE *v.* STATE OF INDIANA.

[No. 3-972A55. Filed April 18, 1973.]

*Patrick Brennan, Michael P. Scopelitis,* of South Bend, for appellant.

*Theodore L. Sendak,* Attorney General, *John McArdle,* Deputy Attorney General, for appellee.

## I.

### STATEMENT ON THE APPEAL

STATON, J.—James Patton had been drinking. When he approached the outside door of his rooming house in the early morning hours, he could not find his key and started pounding on the door. Several roomers inside were awakened. Zollie Arline came to the door and opened it for James Patton. There was an immediate exchange of words and an argument. James Patton allegedly pulled a pocketknife and cut Zollie Arline on the side of his face. Zollie Arline knocked James Patton to the floor. James Patton was taken to his bedroom by another roomer and Zollie Arline went to the kitchen. Later, Zollie Arline struck James Patton on the head with a "two by four." James Patton died in the hospital as a result of this blow to the head. Zollie Arline was indicted for second degree murder and tried before a jury. During the trial, the prosecutor exaggerated the absence of any pocketknife in his questioning of several state witnesses. Zollie Arline's defense counsel had filed a motion to produce which was granted  The pocketknife was not turned over to the defense by the prosecutor. The knife had been found by a nurse in the pocket of James Patton at the hospital, and she had turned it over to the police. The knife was delivered to the prosecutor by the police before trial. The prosecutor, knowing of the existence of the knife, made an issue of its

absence in evidence during the trial. Zollie Arline was convicted of voluntary manslaughter by a jury.[1] His motion to correct errors raises these questions on appeal for our consideration:

1. Was the suppression of the knife evidence suppression of favorable evidence to the defense of Zollie Arline?
2. Did the continual reference to the knife's absence in the evidence by the prosecutor amount to making the knife's absence an issue?
3. Was the presecution's suppression of the knife evidence a denial of due process?

We answer all of the above questions in the affirmative. Our opinion which follows holds that the evidence was favorable evidence and that the exaggeration of the knife's absence by the prosecutor made the knife's absence an issue. The failure to provide the knife before or during the trial amounted to the denial of due process of law. We reverse the trial court's judgment with instructions.

## II.
### STATEMENT OF THE FACTS

In the early morning hours of September 4, 1971, James Patton returned to his rooming house at 1215 Colfax Street, South Bend, Indiana. He had forgotten his key so he commenced to pound upon the front door. Inside the rooming house, Zollie Arline was aroused by two fellow roomers, Dunnigan and Hicks. Arline went to the front door to admit Patton. According to Arline, Patton pulled a pocketknife and came toward him. Arline knocked the knife aside and hit Patton who fell to the floor. Arline had been cut on the cheek by Patton's knife. The roomers, Dunnigan and Hicks, came into the living room after the affray.

At the trial, Dunnigan testified that Patton appeared to be intoxicated and that Patton kept repeating that he was drunk and did not want to fight Arline. Patton was assisted

---

1. IC 1971, 35-13-4-2; Ind. Ann. Stat. § 10-3405 (Burns 1972 Supp.)

back to his room, and when Dunnigan returned to the living room, Arline was in a rage. Dunnigan further testified that:

". . . He went back in the kitchen and he said son-of-a-bitch to Patton and Patton didn't say nothing. And he came back again and went in the sitting room, went back and come out and turned on the light and there were some shovel[s] sitting there. So, we jumped up and he said no, this won't do. He grabbed a shovel—I think it was a shovel or a hoe or something, and he said no, this won't do. And so I laid on back down. I thought maybe the man was going on back to bed and forget about it."

Dunnigan heard noises later in Patton's room and investigated. He saw Arline coming from the bedroom with a "two-by-four" in his hands and muttering that he had fixed Patton and that he was going to call the police: ". . . [O]r somebody to come and get this ——— before I kill him or or finish killing him, something like that he said on the phone. . . ."

Arline testified that he went to the basement to administer first aid to his cheek wound. When he came back upstairs and walked down the hallway to the bathroom, Patton came storming out of his bedroom with a pair of shears in his hand. Arline saw a "two-by-four," picked it up and swung at Patton. The blow knocked Patton back into the bedroom. This is Arline's rendition of what happened on the night of September 4, 1971.

Patton died two days after arriving at the South Bend Memorial Hospital from a severe pulmonary edema. The medical expert explained that pulmonary edema is caused by shock followed by a filling of the lungs with liquid. In his opinion, the cause of death was "the blow on the head [which] set in motion a train of events which led to shock and the acute pulmonary edema."

Arline was indicted for second degree murder, tried by jury and found guilty of voluntary manslaughter. After the trial was over, Arline's defense counsel was informed that the prosecutor had in his possession a pocketknife al-

legedly taken from Patton's pocket when Patton was admitted to the South Bend Memorial Hospital. The issues raised by the motion to correct errors filed by Arline are set forth in our "Statement of the Issues" section below.

## III.
## STATEMENT OF THE ISSUES

The three issues presented by this appeal will be discussed together in our "Statement on the Law" section of this opinion. These three issues are:

1. Was the suppression of the knife evidence suppression of favorable evidence to the defense of Zollie Arline?
2. Did the continual reference to the knife's absence in the evidence by the prosecutor amount to making the knife's absence an issue?
3. Was the prosecution's suppression of the knife evidence a denial of due process?

## V.
## STATEMENT ON THE LAW

The main thrust of Arline's contention is that the prosecution's intentional suppression of the pocketknife was a denial of due process.[2] He relies primarily upon *Brady* v. *Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215, wherein Justice Douglas stated:

> "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Since *Brady* v. *Maryland, supra,* there has been a proliferation of federal and state court decisions. For an excellent summary of such cases, see 34 A.L.R. 3d 16.

*Moore* v. *Illinois* (1972), 408 U.S. 786, 92 S.Ct. 2562, 33

---

2. The prosecutor in his affidavit attached to the motion to correct errors and his testimony at the hearing on the motion to correct errors conclusively demonstrates that he knew of the existence of the pocketknife during the trial and that he intentionally withheld the same from the defense.

L. Ed. 2d 706, has clarified *Brady* v. *Maryland, supra,* by setting forth a test to be applied where there is a suppression of evidence by the prosecution. This test is:

[A] Suppression by the prosecution after a request by the defense,

[B] The evidence's favorable character for the defense, and

[C] The materiality of the evidence.

In the present case, we are dealing more with a fundamental unfairness than with a non-disclosure. A proper question would be: Did the suppression of the evidence place the defendant in a constitutionally unfair position? Where this situation is suggested by the evidence as well as by the conduct at trial of the prosecution or the defense, a request for the disclosure of the evidence is not a *sine qua non* to establish a duty on the part of the prosecution.[3] This distinguishes the present case from *Brady* V. *Maryland, supra,* and *Morris* v. *Illinois, supra,* where a request for the item of evidence must be made before the test set forth in *Moore* v. *Illinois, supra,* may be applied.[4]

---

3. *Ashley* v. *Texas* (5th Cir. 1963), 319 F. 2d 80; *United States ex rel. Thompson* v. *Dye* (3rd Cir. 1955), 221 F. 2d 763; *United States ex rel. Almeida* v. *Baldi* (3rd Cir. 1952), 195 F. 2d 815; 33 A.L.R. 2d 1407; *Alcorta* v. *Texas* (1957), 355 U.S. 28, 78 S. Ct. 103, 2 L. Ed. 2d 9; *United States ex rel. Meers* v. *Wilkins* (2nd Cir. 1964), 326 F. 2d 135, 137. In *United States ex rel. Meers* v. *Wilkins, supra,* the court stated that a request for disclosure is not a *sine qua non* to establish a duty on the prosecution's part.

4. Zollie Arline did make a motion to produce in the present case. This motion was very general as to some evidence and very specific as to other evidence. The specificity of the motion is not discussed in detail here or set out since a request for the disclosure of the knife is not *sine qua non* to establish a duty on the part of the prosecution.

In *Brady* v. *Maryland, supra,* there was a request for extrajudicial statements made by the codefendant. In *Moore* v. *Illinois, supra,* the prosecution had given its entire file to the defense. There is some indication that the requested statement had been overlooked in the prosecutor's file by the defense. In any case, misidentification of Moore was not a material issue. Whether Moore was "slick" or not did not raise an identification issue.

Some analysts may consider the additional requirements of "favorable evidence" and "material" evidence in *Moore* v. *Illinois, supra,* a retrenchment of the position taken in *Brady* v. *Maryland, supra.* However, a more plausible analysis is that *Moore* v. *Illinois* is merely a clarification of *Brady* v. *Maryland* since a non-disclosure which is neither favorable nor material would not constitute error.

The nurse at the hospital had found the knife in Patton's pocket and had given it to the police. The knife was given to the prosecutor before trial. It is quite possible that the existence or nonexistence of the knife in evidence would not have been cloaked with favorable materiality, but the prosecution exaggerated its absence in evidence, made its absence an issue and materially mislead the jury. The culminating effect was to discredit the defendant's defense, to make the production of the knife evidence favorable to the defendant, and to place the defendant in a constitionally unfair position. Some examples of the prosecution's references to the knife are as follows:

[Testimony of Officer Kenneth Delinski.]

"Q. When you were in the bedroom where the body was did you see any weapons in there?

"A. Only what would be similar to hedge shears that laid on the — like a nailed together wooden box, a crate like, which was covered with a scarf. This pair of scissors — hedge shears laid on top of this box.

"Q. Did you see any knives?

MR. BRENNAN: I am going to object, if your Honor please.

THE COURT: Sustained.

"Q. Did you see any other weapon or weapons?

"A. No, not other than the shears."

[Testimony of Officer Charles Mahank]

"Q. And did he talk to you?

"A. He continued talking, saying the same thing that he said in the house.

"Q. And what was that?

"A. That Mr. Patton came home and knocked on the door and when he let him in the house he raised cane and they had an argument about the door not being opened, and that Patton had gone to his bedroom and a short while later Mr. Arline stated that he had gone to the bathroom and he was set upon by Mr. Patton who came out of his room with a knife. He said it was a large penknife.

"Q. Did he describe how large it was?

"A. He just said 'large penknife.'

"Q. Did you find a large penknife any place?

"A. No, sir."

[Testimony of Officer Raymond Woodward.]

"Q. Did Mr. Arline say where Mr. Patton was when he went from the bathroom to the other room to get this two-by-four?

"A. He was running after him.

"Q. Did he say what kind of a knife he had?

"A. A pocket knife.

"Q. Did he describe how large this pocket knife was?

"A. He said it was a big one, but that was all.

\* \* \*

"Q. Did you see any weapons in there of any kind?

"A. No.

"Q. Did you see a large pocket knife of any kind in there?

"A. No. We searched the room and couldn't find one.

"Q. Did you see a large pocket knife in the house at all?

"A. No." ·

[Testimony of Ronnie Dunnigan.]

"Q. Now, on that night, at any time that night, did you see James Patton with a knife attack Zollie Arline?

"A. I never did.

"Q. Did you ever see him at any time attack him with a pair of grass clippers?

"A. (no response)

"Q. Did you ever see Patton attack Arline at all?

"A. I sure haven't."

In *State* v. *Thompson* (1965), Mo. 396 S.W.2d 697, the defendant had been tried and convicted of first degree murder. He had contended during the trial that he did not fire his revolver and that he was standing outside the car with his hands up. He further contended that his companion had drawn his revolver and shot the policeman in back of the car. Shell casings had been found by the deceased policeman's father at the scene and delivered to the police for analysis. The report stated that the eight shells were fired from a P-38 Walther (semi-automatic) pistol. The

defendant had a Browning (semi-automatic) pistol. The pistols were produced at trial, but no shell casings were produced and the report was not produced The absence of shell casings at the scene was argued by counsel at length. The defendant contended that he was denied due process under *Brady* v. *Maryland, supra,* since the prosecutor did not disclose this evidence to him before or during the trial. In *State* v. *Thompson, supra,* 396 S.W.2d at 702, the court stated:

> "If we had here the mere failure of the prosecution to produce the shell casings and the ballistics report, we would have a materially different question. . . . Arguments could be made here to justify a mere non-production, . . . We do not rule [on] this point on mere nonproduction. The situation was grossly exaggerated by the argument of the Prosecutor. . . . We do not attribute any bad faith to the Prosecutor, nor do we need to do so; his statements were obviously made in the heat of the argument. But the statement, made in words or substance, *that no shells were found,* materially misled the jury. . . . We hold that the non-production *and* the argument placed the defendant in a constitutionally unfair position; for this reason, *only,* the judgment and sentence must be vacated."

In *United States ex rel. Almeida v. Baldi* (3rd Cir. 1952), 195 F.2d 815, the defendant had been charged under the felony-murder rule with killing an off-duty policeman during the holdup of a supermarket. The off-duty policeman had been shot in the front of the supermarket. The jury had been instructed that if they found Almeida guilty of first degree murder, then they should fix the penalty at life imprisonment or death. Almeida was found guilty and death was fixed as his punishment. The evidence established that Almeida was firing a forty-five caliber revolver and that only the police had been firing thirty-eight caliber Smith and Weston revolvers. The off-duty policeman had been shot with a thirty-eight caliber revolver. Officer Mark McGinley made a statement to the Homicide Squad that he fired a shot outside the supermarket and that a man had fallen to the ground and that no other man fell. The court stated that ". . . who killed Ingling was a

relevant issue as to penalty to be imposed by the jury at the trial, perhaps the most relevant one." The thirty-eight bullet was not produced at trial, and Lt. Spangler testified that prior to his taking the stand, he was asked not to mention the blood on the thirty-eight caliber bullet that he found near the decedent. The prosecution had been asked whether or not there were any other bullets than those in evidence. The court held in *United States ex rel. Almeida* v. *Baldi, supra*, that the suppression of the evidence favorable to Almeida was a denial of due process, and that the prosecution "overreached" in its prosecution of Almeida.

## V.
## DECISION OF THE COURT

The non-production of the knife coupled with the prosecution's trial conduct which exaggerated the knife's absence in evidence, made the knife's absence an issue and changed the knife into favorable evidence for the defendant. The culminating effect of the prosecution's non-disclosure of the knife was to discredit the defendant's defense, mislead the jury and to place the defendant in a constitutionally unfair position thereby denying him due process of law. Therefore, the judgment of the trial court should be and the same hereby is reversed with instructions to grant the defendant a new trial.

Hoffman, C.J., and Sharp, J., concur.

NOTE.—Reported at 294 N.E.2d 840.