HILTON RICHARD, JR. *v.* STATE OF INDIANA.

[No. 277S141. Filed November 22, 1978.]

*Harriette Bailey Conn*, Public Defender of Indiana, *Kyle M. Payne*, Deputy Public Defender, for appellant.

*Theodore L. Sendak*, Attorney General, *Charles D. Rodgers*, Deputy Attorney General, for appellee.

PIVARNIK, J.—Appellant Richard was convicted by a jury in the LaPorte Superior Court of the second-degree murder of David Turner in October, 1971. His conviction was affirmed by this court. *Richard* v. *State*, (1975) 262 Ind. 534, 319

N.E.2d 118. Appellant filed a petition for post-conviction relief pursuant to Ind. R. P.C. 1 in the LaPorte Superior Court on July 21, 1975. This petition was denied by the trial court, after a hearing, on June 10, 1976. The present appeal follows.

Three issues are asserted in the present appeal: (1) that one of appellant's trial attorneys acted as a pro-tem judge in this case before his appointment as counsel; (2) that the trial court excluded alibi testimony in appellant's original trial, and; (3) that appellant was denied due process of law because of alleged failures of the prosecutor to turn over certain evidence to the defense.

## I.

Appellant first argues that one of his trial attorneys, Mr. Kitowski, improperly acted as a pro-tem judge in this case before his appointment to represent appellant. As pro-tem judge, Kitowski had accepted the grand jury's indictment of appellant. This fact, it is now asserted, denied appellant effective assistance of counsel.

The issue raised here is not even an issue presentable under our post-conviction rules. The fact that attorney Kitowski had signed some perfunctory orders as a pro-tem judge in this case was well known to everyone at trial, as it appeared on the very record of the cause. Co-counsel Sweeny testified at the post-conviction hearing that he and everyone else were very much aware of this, and considered it unimportant, as Kitowski acted only in a perfunctory manner. Further, if anything, this fact would have been of benefit to the appellant rather than a detriment to him in Sweeny's view, since Kitowski was known as an experienced criminal lawyer in the Michigan City area. This issue was not raised in appellant's original appeal to this court, although it was then known to all parties. Thus, we fail to see any sort of newly discovered evidence here, and on the merits see no prejudice to appellant or reversible error arising from these facts.

## II.

It is next argued that the trial court, in the original trial, erroneously excluded the alibi testimony of one Donald Nelson. The court ruled that appellant had failed to file statutory notice of alibi when this witness was presented.

The fact that the court, *sua sponte,* struck this alibi testimony was not questioned by the appellant in any manner at the time it was done, nor at the time the court instructed the jury on it at the close of the trial. No objection was made by the defense in any manner as to that procedure. Attorney Sweeney testified at some length at the post-conviction hearing as to the determinations and strategy he worked out in the case with reference to the alibi used by the defense. No question was raised in the original Motion to Correct Errors, nor on appeal to this court in 1974. This was a matter well within the knowledge of the parties at that time and was an appealable issue at that time. It therefore is not an issue available to appellant in a post-conviction motion. Incidentally, Sweeney's tactical decision was based on the fact that appellant had given him two different stories for his alibi, and that the alibi witness testified as to Sunday night, April 18, rather than Saturday night, April 17, as the night that he spent at the YMCA with appellant. On April 18, the appellant was in jail for this charge and could not have been at the YMCA. Again, we fail to see any claim cognizable under our post-conviction rules here, and on the merits find no prejudice to appellant or reversible error arising from these facts.

## III.

The third, and most serious question raised in this case is a claim that the prosecutor wrongfully withheld evidence from appellant before trial. Appellant asserts that certain exculpatory statements of an on-the-scene witness, Charles Thomas, were suppressed, along with the whereabouts of

another potential witness, Andrew White. Neither of these men testified at trial. Thomas has never testified at any stage of this case, though White testified at the post-conviction hearing.

Initially, it must be recognized that the underlying legal question in this case concerns the scope of the prosecutor's duty to disclose evidence, under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. All cases in this area are now governed by the recent United States Supreme Court opinion in *United States* v. *Agurs*, (1976) 427 U.S. 97, 96 S.Ct. 2392, 49 L.E.2d 342. Like many areas of constitutional criminal procedure, the duty of disclosure has been developing by a case by case approach in recent years. In *Brady* v. *Maryland*, (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the duty was stated to be of constitutional dimension, as a matter of due process and the right to a fair trial. *See also White* v. *State*, (1975) 263 Ind. 302, 330 N.E.2d 84; *Fair* v. *State*, (1969) 252 Ind. 744, 250 N.E.2d 744. There are many types of fact situations in which this duty comes into question, however, arising out of differences in prosecutorial conduct, defense requests, and the kind of information requested or withheld. *Agurs* reviews all these types of cases by type and sets the due process review standards for each, thus injecting a principled and orderly process of analysis for what was formerly unsettled. Before turning to a specific discussion of the present case, then, it is appropriate to understand the various standards applicable to review of omitted evidence under *Agurs*.

*United States* v. *Agurs* outlines three types of cases in which the prosecutorial duty of disclosure comes into question: (1) cases in which undisclosed evidence demonstrates that the prosecution's case includes *perjury;* (2) cases in which the defense has made a *pre-trial request for specific evidence,* and; (3) cases in which evidence was not disclosed but where there was only a *general request* for discovery by

the defense or no request at all. On review, the test applicable to determining the materiality of the omitted evidence is dependent on which of the three types of cases is at hand. *Agurs, supra,* 427 U.S. at 103-7, 96 S.Ct. at 2397-99, 49 L.Ed. 2d at 349-52.

The first type of case, involving prosecutorial use of perjury, was recognized by this court's opinions in *Biggerstaff* v. *State,* (1977) 266 Ind. 148, 361 N.E.2d 895, 899, and *Birkla* v. *State,* (1975) 263 Ind. 37, 42, 323 N.E.2d 645, 648, *cert. denied,* (1975) 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77. A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and a corruption of the truth-seeking function of the trial process, *Agurs, supra,* 427 U.S. at 103-4, 96 S.Ct. at 2397, 49 L.Ed.2d at 349-50, and this rule includes known false testimony relating to the credibility of a state's witness, *Birkla, supra.* See also *Donnelly* v. *DeChristoforo,* (1974) 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431; *Giglio* v. *United States,* (1972) 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104; *Miller* v. *Pate,* (1967) 386 U.S. 1, 82 S.Ct. 785, 17 L.Ed.2d 690; *Napue* v. *Illinois,* (1959) 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217; *Alcorta* v. *Texas,* (1957) 355 U.S. 23, 78 S.Ct. 103, 2 L.Ed.2d 9; *Pyle* v. *Kansas,* (1942) 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214; *Mooney* v. *Holohan,* (1935) 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791. The standard of review to be applied to these cases is that the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs, supra,* 427 U.S. at 103-4, 96 S.Ct. at 2397, 49 L.Ed.2d at 349-50. This is thus a strict standard of materiality and the highest level of scrutiny imposed in this area of law, made in view of the inherent dangers that perjury poses to our system of justice.

The second type of case in which the prosecutorial duty of disclosure comes into question is characterized by a pre-trial

request by the defense for specific evidence. The case of *Brady* v. *Maryland*, (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, presented this situation, since it involved a specific request by defense counsel for the extra-judicial statements made by defendant's accomplice. *See Agurs, supra,* 427 U.S. at 104-6, 96 S.Ct. at 2397-99, 49 L.Ed.2d at 350-51; *Birkla, supra,* 263 Ind. at 42, 323 N.E.2d. at 648. When such a request has been made, and requested evidence favorable to the accused is suppressed, a medium level of review is applied: the conviction will be reversed if the evidence "might have affected the outcome of the trial." *Agurs, supra,* 427 U.S. at 104, 96 S.Ct. at 2398, 49 L.Ed.2d at 350. Prosecutorial failure to honor requests for evidence, for which a substantial basis for claiming materiality exists, is thus "seldom, if ever" excusable. The relatively high level of appellate scrutiny given to the omitted evidence in these cases is based on the fact that the prosecutor is able to assess materiality when he knows precisely the object of his consideration. *White* v. *Maggio,* (5th Cir. 1977) 556 F.2d 1352, 1357. Thus, in order to invoke this level of review, the defendant must show that his pre-trial request, "gave the prosecutor notice of exactly what the defense desired." *Agurs, supra,* 427 U.S. at 106, 96 S.Ct. at 2398-99, 49 L.Ed.2d at 351.

The third class of cases discussed by *Agurs* arise when there has been either a general request for discovery, or no request at all. These types of cases would thus include *"Keller* discovery" in this state, under the case of *State ex rel. Keller* v. *Criminal Court of Marion County,* (1974) 262 Ind. 420, 317 N.E.2d 433. They would also include requests couched in such general language as, for example, "any evidence regarding each potential trial witness that may tend in any respect to reflect adversely upon his credibility or upon his ability to observe and comprehend the events about which the witness intends to testify." *United States* v. *Hearst,* (N.D. Cal. 1977) 435 F.Supp. 29, 30. *See also United States* v. *Lasky,* (9th Cir. 1977) 548 F.2d 835.

When defense requests are phrased so generally, the prosecutor's duty to disclose can be measured only by reference to the question of whether the evidence in his possession is so "obviously exculpatory" that his failure to turn it over denied the defendant a fair trial. *Agurs, supra,* 427 U.S. at 107, 96 S.Ct. at 2399, 49 L.Ed.2d at 351. Indiana has recognized that this voluntary disclosure duty on the part of the prosecutor exists when there has been an actual "deal" made with a state's witness, such as promises, grants of immunity, and rewards offered in return for testimony. *See Hoskins* v. *State,* (1978) 268 Ind. 290, 375 N.E.2d 191, 194; *Newman* v. *State,* (1975) 263 Ind. 569, 572-73, 334 N.E.2d 684, 686-87; *Birkla, supra,* 263 Ind. at 42, 323 N.E.2d at 648; *Adler* v. *State,* (1967) 248 Ind. 193, 197, 225 N.E.2d 171, 173. *Compare Walker* v. *State,* (1978) 267 Ind. 649, 372 N.E.2d 739. In cases concerning other kinds of omitted evidence, however, which is not either a demonstration of perjury or the subject of a specific request by the defense, the least stringent review standard under *Agurs* applies. This standard for *Agurs* "type III" cases is that the omitted evidence, as "evaluated in the context of the entire record," must create "a reasonable doubt that did not otherwise exist":

> "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor significance might be sufficient to create a reasonable doubt."

*Agurs, supra,* 427 U.S. at 112-13, 96 S.Ct. at 2401-2, 49 L.Ed. 2d at 355. *See, e.g., Cannon* v. *State of Alabama,* (5th Cir. 1977) 558 F.2d 1211.

*Agurs* itself was a "type III" case. The essence of the Supreme Court's opinion was that it is the denial of a fair trial which is central to the due process considerations in such cases, rather than the reviewing court's opinions about the prosecutor's conduct:

"Nor do we believe the constitutional obligation is measured by the moral culpability, or willfulness, of the prosecutor. . . . If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."

*Agurs, supra,* 427 U.S. at 109, 96 S.Ct. at 2400, 49 L.Ed.2d at 353. *See also Buchanan* v. *State,* (1975) 263 Ind. 360, 367, 332 N.E.2d 213, 219. The Supreme Court also stated in the same vein:

"[U]nless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose."

*Agurs, supra,* 427 U.S. at 108, 96 S.Ct. at 2399, 49 L.Ed.2d at 352. Discussion of prosecutorial "morality" is thus completely irrelevant in *Agurs* "type III" cases. Rather, in the absence of either perjury "type I" cases, or specific request "type II" cases, "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt." *Agurs, supra,* 427 U.S. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 354. In light of this emphasis, it is necessary to somewhat refine the terminology which surrounds all of these cases. For instance, there is a difference between prosecutorial suppression and prosecutorial omission of evidence. The term "suppression" really has no substantive meaning in a "type III" case. That term is properly confined to the *Agurs* "type I" and "type II" cases, involving either perjury or the act of the prosecutor in not turning over evidence to the defendant after a specific request. *See Garrison* v. *Maggio,* (5th Cir. 1976) 540 F.2d 1271, 1274. In this respect, this court's only previous discussion of *Agurs* in *State* v. *Wright,* (1978) 267 Ind. 590, 372 N.E.2d 453, was to some extent misstated. While generally correct, the court said in that "type III" *Agurs* case, "Furthermore, there was no claim of actual suppression of any evidence." *Id.* at 455. The term "suppression" is particularly inappropriate where the central

inquiry is whether or not the character of the evidence itself would put the prosecutor on notice of its materiality.

Also, this court's previous, general statement about voluntary disclosure in *Birkla, supra,* 263 Ind. at 43, 323 N.E.2d at 649, that "a heavy burden rests upon the prosecution to demonstrate that the destruction of such evidence did not prejudice the defendant," must thus now be read in light of the teaching of *Agurs.* This teaching, we think, is that *Birkla* describes the standard of review appropriate to omitted "type III" evidence at the trial court level, and *Agurs* describes the standard of review appropriate to omitted evidence on appeal. Practically and substantively, the two descriptions are of the same quantum of evidence for due process purposes, and the *Agurs* standard controls the *Birkla* standard, in case of interpretive conflict, because it is more inclusive. *Birkla,* however, is valid to the extent that it describes how the prosecutor's burden becomes inherently "heavier" when he intentionally withholds evidence, the importance of which he has exaggerated at trial. *Birkla, supra, citing Arline* v. *State,* (1973) 156 Ind. App. 95, 294 N.E.2d 840. This description is consistent with *Agurs,* since it does not focus on prosecutorial conduct in the abstract, but only on instances where that conduct is itself probative of the materiality of the omitted evidence.

With the above framework for analysis outlined, we now turn to the operative facts and circumstances of the present case. In this court's former opinion affirming appellant's conviction on direct appeal, *Richard* v. *State,* (1974) 262 Ind. 534, 319 N.E.2d 118, the issue of sufficiency of evidence was addressed in the following words:

> "It is not necessary to relate all of the evidence to demonstrate that the defendant's insufficiency contention is without merit. An eye witness, whose credibility was attacked by the defendant, testified that she saw the defendant confront the decedent as he approached the house where the defendant's wife resided with her parents. The witness also testified that the defendant instructed the decedent

to turn around and go away, and that as the decedent turned and walked away, the defendant shot him in the back of the head with a sawed-off shotgun.

"Shortly before the shooting, the defendant visited the home of his wife's brother. He had with him a sawed-off shotgun. At the time of his arrest, the following day, he had with him a sawed-off shotgun wrapped in a towel.

"The defendant's testimony refuted the aforementioned incriminating evidence, but the jury elected to disbelieve him. This argument here seeks to have us reweigh the evidence, which we cannot do. He contends that the testimony of the eye witness is so lacking in credibility as to have no probative value. It is settled that the trier of facts is the sole judge of the weight of the evidence and the credibility of the witnesses."

*Id.*, 362 Ind. at 537-38, 319 N.E.2d at 120-21. The eyewitness referred to above was Barbara McBride. She testified at trial that she was with five people, on a porch across the street, when she saw the crime. She testified that two of these people were Andrew White and Charles Thomas. Neither White nor Thomas testified at appellant's trial. Their absence at trial, as it reflected on witness McBride's credibility, was before this court on the former appeal, and was the disputed issue of credibility, discussed at that time by this court. The questions raised in the post-conviction hearing focus anew on the credibility of witness McBride, and on the absence of White and Thomas.

The first thing that must be done here is to characterize the present claim under the *Agurs* guidelines. There is absolutely no demonstration that perjury was committed in the present case. Appellant's brief in the present appeal colors the case as involving perjured testimony at one point, but this is a mere assertion, unsupported by any fact brought forward at the post-conviction hearing. Thus, the present case is not "type I," under *Agurs*, and not subject to the strictest review standards. There is, however a present claim that evidence requested by the defense was withheld by the prosecutor. It is therefore critical in this case to determine whether the

present case fits in under either "type II" or "type III" of *Agurs*.

The pertinent parts of appellant's pre-trial Motion for Discovery read as follows:

> "At a bail hearing on June 21, 1971 several police officers indicated that they had taken written statements from various persons in connection with this matter, including the defendant.
>
> . . . .
>
> "In order for the defendant to prepare his defense to the charge and to avail himself of competent and intelligent assistance of counsel, it is necessary that the statements given to the various officers of the Michigan City Police Department . . . be made available to the defendant.
>
> . . .
>
> "WHEREFORE, I respectfully pray that the Court order the Prosecuting Attorney to furnish to the defendant a copy of each statement given the Michigan City Police Department by anyone interrogated in connection with this criminal cause. . . ."

At the post-conviction hearing in this case, police reports made on the night of the murder were admitted into evidence as petitioner's exhibits nos. 6, 7, and 8. These exhibits were notes made by police officers about people they had interviewed, one of them being Charles Thomas. A total of eight sentences from these notes refer to Charles Thomas, and are in the form of the investigating officer relating the essentials of an on-the-scene oral statement by Thomas to him, in which Thomas admitted he could not identify the killer. Appellant claims that this statement of Thomas, who did not testify at trial, was "suppressed" and "was never given to the defense." A good argument can be made that the defense request in the present case lacks the requisite specificity, under *Agurs* "type II," to "give the prosecutor notice of exactly what the defense desired." *See United States* v. *Hearst*, (N.D. Cal. 1977) 435 F.Supp. 29. It did not refer to Charles Thomas, its reference to witnesses mentioned at a bail hearing is not clarified by anything in the record, and it refers to "written statements," not to all notes made during the course of police investigation.

There is, however, a much more basic flaw in the claim that the defense was denied information specifically requested of the prosecutor. The record before us strongly infers that the state did in fact produce all requested statements for the defense. That the prosecution furnished all the information in its files, regarding the Turner murder, is admitted by all parties, and was denied by no witness testifying at the post-conviction hearing. In fact, appellant's trial attorney Sweeney was questioned specifically about petitioners' exhibits nos. 6, 7, and 8, and the on-the-scene notes concerning Charles Thomas. While he said that he could not recall specifically whether he had seen them, he stated that he presumed that he had: "I asked for and received what I presume was the complete police file on this, and I presume I have seen this." Also testifying at the post-conviction hearing was Deputy Prosecuting Attorney Michael Brennan. Brennan testified that as far as he was concerned he had furnished all police records and notes to the defense. He does not remember if these specific reports were given, but presumes that they were as his understanding was that he was giving all reports to the defense. He cannot pick any particular one at this time and say which one was in the bundle that he turned over to the defense.

In sum, even granting that the defense request was sufficiently specific, the record in this case indicates that all such requests were granted. There is absolutely no evidence otherwise, and the appellant's argument that this written report was never given to the defense is simply without foundation. Thus, this case is not an *Agurs* "type II" case, a prosecutorial denial of a specific defense request. At most, whatever new evidence was introduced at this post-conviction hearing must be evaluated under the least stringent review standard under *Agurs,* since it is a "type III" case like *Agurs* itself. It is arguable that when the defense has had either possession of or unimpeded access to the prosecutorial files in question, that this fact would foreclose him from ever bringing forward

a "type III" *Agurs* case at all. *See United States* v. *Brown,* (9th Cir. 1977) 562 F.2d 1144, 1151. Nevertheless, we will proceed to review the present evidence.

In reviewing the present post-conviction record as an *Agurs* "type III" case, we must ask whether the "new" evidence presented would create a reasonable doubt which did not otherwise exist in this case, when viewed in the context of the entire record. That omitted evidence, presented at the post-conviction hearing, is directed to two points: (1) the substance of the on-the-scene statements by Charles Thomas to police, and; (2) the whereabouts of Andrew White, who witness McBride had stated was also present at the scene.

Charles Thomas was a sixteen-year-old juvenile whose whereabouts were apparently unknown to anyone at the time of trial. State's chief witness Barbara McBride did place him at the scene on the night of the killing, and sketchy notes of his conversations with the police that night are now, as discussed above, the subject of dispute. The extent of Thomas' statements at that time, as reflected in the police notes of Sergeant Coughlin and Colonel Bigda, and admitted at the post-conviction hearing, are as follows:

> "The first person I talked with was Charles Thomas, Age 16, 306 E 5th St. He stated he was across the street walking up the front porch steps when he heard a shot. He said it was a loud shot and it sound like a shot gun. He turned around and saw a man step from behind a car across the street and run between houses. The only description he could give is that the man had some kind of light brown clothing on. He said that he could not give us a better description, because it was so dark and it happened so fast."

*   *   *   *

> "Charles Thomas age 16, 308½ E 5th St. M.C., was on the front porch and heard a shot, and saw a figure run between the houses. Could not identify."

It appears that much question was raised by the defense during the trial, with reference to the fact that the state did not produce Thomas as a witness. This appears to be the reason

that the state produced police witnesses who testified at length as to their attempts to find Thomas and to present him as a witness. The implication drawn by the appellant, that the state at trial was trying to give the jury the impression that Thomas never made a statement, is simply one possible interpretation, and in our opinion not a good one. Thomas' absence was also stressed, as bearing upon witness McBride's credibility, in the previous appeal to this court, discussed earlier.

Assuming that the above statements of Thomas were in fact not given to the defense, the reasoning goes that they were withheld by the prosecution for some ulterior motive. It is true that the officer testifying in the trial, as to his efforts to find Thomas, did not state that he or any of his colleagues had talked to Thomas that night. It is also true, however, that the officer was never asked about it by *anyone,* and we must again speculate on whether or not he would have been permitted to tell what Thomas told him, outside the presence of defendant, during the investigation on that night. At any rate, it is clear that the present case is not of the mold of *Arline* v. *State,* (1973) 156 Ind. App. 95, 294 N.E.2d 840, *cited in Birkla* v. *State,* (1975) 263 Ind. 37, 43, 323 N.E.2d 645, 648, of the prosecution intentionally withholding evidence which it knows is material and consciously exaggerating its importance at trial. In fact, the on-the-scene statements of Thomas, whatever their value, certainly cannot be characterized as "exculpatory," favorable to the defense, or even "impeaching" of witness McBride. Thomas' story, such that it is, tends to corroborate the state's case in all important respects, except for the fact that he could not identify, and it also corroborates McBride's credibility, on her statement that Thomas was there that night. The most that can be said about this "new evidence," in short, is that it is cumulative of other evidence in the case.

Turning to the testimony of Andrew White, at the post-conviction hearing, we have only a case of his word against

McBride's on whether he was there on the night in question. The evidence does not show, as the appellant asserts, that White *could not* have been at the residence in Michigan City on April 17. It is true that White was convicted of second-degree burglary on May 15, 1970, and was sentenced and committed to the Indiana Reformatory for a period of an indeterminate term of from one to five years. He was released on May 17, 1971, a month after the murder in question. However, he testified that on and after August of 1970 he was at the honor farm at Medaryville, Indiana, and on two occasions had been on leave and was allowed return to his neighborhood in Michigan City. As a matter of fact, he was there in March of 1971. He said that he was in Michigan City in December of 1970 and March of 1971, but that he had never spent the night in Michigan City until his release in May of 1971. Under the circumstances, he could have been in Michigan City in April of 1971, as Miss McBride said he was. In short, the only question presented by White's testimony at the post-conviction hearing is a question of his credibility against McBrides', and the effect of such evidence, at most, is to impeach McBride.

It should also be noted here that there is no evidence that one of the prosecuting attorneys talked to White in prison about a plea bargain for his testimony in the Turner case. There is evidence that White's attorney for a charge of burglary which he faced in June of 1971, one Mr. Fedder, talked to White in prison. Fedder told White that he could get White a reduced sentence if White could testify in the Turner murder case. White told his attorney that he knew nothing about the Turner case, and he heard nothing more about it after that. The prosecuting attorney said he had no recollection of ever discussing with anyone a plea bargain with White in regard to his testimony in the Turner case.

In sum, the "new evidence" presented at the post-conviction hearing is only of the following effect: Thomas' cryptic on-

the-scene statements, which are at the most cumulative, and White's post-conviction story, which is at the most impeaching. If we can consider such evidence being presented to the jury at trial, it is very doubtful that it would create a reasonable doubt which did not otherwise exist, when taken together with all of the other evidence and viewed in that context. The fact that omitted evidence is merely cumulative will usually lead to a conclusion that it will not meet the "reasonable doubt that would not otherwise exist" test under *Agurs* "type III." *See United States* v. *Brown*, (9th Cir. 1977) 562 F.2d 1144, 1150-51. *See also Agurs, supra,* 427 U.S. at 113-114, 96 S.Ct. at 2402, 49 L.Ed. 2d at 355. As for evidence which is, at most, impeaching, it has been said that, "The inevitable uncertainty about the impact of impeachment matter means that such evidence can rarely clear the bar, and consequently a prosecutor is seldom required to volunteer it to the defense." *Garrison* v. *Maggio*, (5th Cir. 1976) 540 F.2d 1271, 1274. *See also id.* at 1276 (Wisdom, J., dissenting) ("Because impeachment evidence is less likely to give rise to a reasonable doubt than exculpatory its nondisclosure would serve as a basis for a new trial less frequently than the nondisclosure of exculpatory evidence"). It has also been noted that, "[A]ll of the reported cases which have granted relief on the basis of impeachment evidence under the third *Agurs* test have involved evidence of either threats to prosecute or promises of leniency by the government." *See United States* v. *McCrane*, (M.D. Penn. 1977) 436 F.Supp. 760, 765, *and cases cited therein.* The present case does not involve such evidence of threats or "deals."

The *Agurs,* "type III," standard of review is thus not met. One can always view circumstances in retrospect and speculate as to motive and reach conclusions that may or may not have been apparent at the time of trial.

The judgment of the trial court is affirmed.

Givan, C.J., Prentice, J., concur.

Hunter, J., dissents with opinion in which DeBruler, J., concurs.

### DISSENTING OPINION

HUNTER, J.—I must respectfully dissent from the majority opinion. As the majority has pointed out, the major inquiry in cases such as this is whether the defendant was denied his right to a fair trial. In this case, defendant was convicted of murder and sentenced to life imprisonment primarily on the testimony of one eyewitness. No other witnesses to the murder testified, and defendant presented an alibi defense. I believe that in failing to disclose to the defendant evidence concerning two other alleged eyewitnesses, the state denied him a fair trial.

The one eyewitness who did testify, Miss Barbara McBride, stated that she could identify the defendant as the murderer of David Turner even though it had been a dark night and she had been standing on a porch across the street from where the crime took place. She specifically named two other men standing on the porch with her at that time. Neither of these men testified at the trial. McBride's credibility was attacked by the defense and it was shown that she had not volunteered her testimony until four months after the murder.

At the post-conviction hearing, it was brought out that there was conflicting testimony from both of the other alleged eyewitnesses. One witness, Charles Thomas, had given an oral statement to the police on the night of the murder. He stated at that time that it was too dark for him to identify the murderer. This statement contradicted McBride's testimony as to the amount of light at the scene of the crime.

Although there is conflicting evidence as to whether defendant's counsel ever saw a copy of Thomas's statement, which allegedly was part of the police officer's notes taken at the scene of the crime and later given to the defendant, it is clear that Thomas did not testify at trial. Police officers did testify at length as to their attempts to find Thomas but did

not refer to any statements he may have made. This *emphasis* on the attempts to find Thomas, without any reference to the fact that he had already given an oral statement, created the impression that the state was still looking for Thomas because he had not yet given any statement and that he probably would be able to corroborate McBride's testimony.

However, even more significant additional information was brought out at the post-conviction hearing about the other alleged eyewitness, Andrew White. The record shows that White's attorney had talked to White in prison *before* defendant's original trial. The attorney offered White a reduced sentence in return for testimony White could give about the Turner murder case. White clearly stated to the attorney that he was *not* present at the scene of the Turner murder because he had been in prison on that date. While it is true that the prosecutor himself may never have talked to White, he certainly should have been aware of any plea bargain offered in exchange for testimony in this case. The fact that White had been located in jail was not disclosed to the defendant nor were any of his statements.

Since the testimony of the one eyewitness, McBride, was so crucial to this case, the testimony of the other alleged eyewitnesses which was conflicting was certainly material. As Justice Marshall points out, one of the most basic elements of fairness in a criminal trial is that available evidence tending to show innocence, as well as that tending to show guilt, be fully aired before the jury. It is especially important that the state in its zeal to convict a defendant not ignore evidence that might exonerate him. *United States* v. *Agurs*, (1976) 427 U.S. 97, 116, 96 S.Ct. 2392, 2403, 49 L.Ed.2d 342, 357 (dissenting opinion).

I believe the defendant in the instant case was denied his right to a fair trial and should be granted a new trial.

DeBruler, J., concurs.

NOTE.—Reported at 382 N.E.2d 899.