Arden C. SCHULTZ, Appellant,

v.

STATE of Indiana, Appellee.

No. 1085S407.

Supreme Court of Indiana.

Sept. 15, 1986.

Nathaniel Ruff, Merrillville, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Arden C. Schultz was found guilty by a jury in the Lake Superior Court, Criminal Division, of the crime of murder, and was sentenced to a term of fifty-five (55) years. He raises three issues for our review in this direct appeal as follows:

1. denial of Appellant's post-trial motion for the appointment and compensation of experts;

2. failure of the State to comply with discovery orders; and

3. refusal of Appellant's motion to sequester the jury.

Appellant was tried for the murder of Thomas Melcher. The evidence showed that Stanley McNight and Melcher had known each other for six or seven years and were engaged in drug trafficking together. For several weeks prior to his

death, Melcher made connections for McNight to buy heroin from a third party, using McNight's money. Melcher would then attempt to sell the heroin for McNight. Melcher had not paid McNight some nine-hundred dollars ($900.00) for heroin McNight had left with Melcher nor had he returned the heroin to him. Melcher told McNight that he threw the drugs into a field after being stopped by the police. McNight did not believe the story and felt that Melcher was "ripping him off."

Stanley McNight testified for the State. He plea bargained with the State, pleading guilty to a charge of conspiracy to commit murder, and receiving a term of twelve years. McNight testified he told Appellant about his problems with Melcher, and Appellant agreed to assist McNight by "beating up" on Melcher. Late on the afternoon of November 5, 1980, McNight and Appellant picked Melcher up at his house and rode around with him. McNight accused Melcher of lying about losing the drugs. During this ride, Appellant hit Melcher with "zap" or leaded gloves. At Appellant's request, they then drove to a secluded, dark road where they stopped the car and Appellant and Melcher exited the car and went into an adjacent field. Appellant was carrying a shotgun at the time. McNight waited in the car. Five or ten minutes later, McNight heard a shotgun blast, and a few minutes later, Appellant returned to the car. Appellant told McNight he had shot Melcher. He also had one-hundred dollars ($100.00) he had taken from Melcher's body. Later, this money was divided.

Appellant testified he left McNight and Melcher after he had beaten Melcher with the leaded gloves because he was tired of hearing them argue. Forty-five minutes later, McNight returned without Melcher. Both agree that at that time they drove to Appellant's house together. They were seen there by other persons. Patricia Ferrell was one of the persons there, and said McNight and Appellant were partying and that Appellant told her he had to party because he had left too much evidence behind. McNight further testified that at about 4:00 a.m. the next morning, Appellant telephoned him and stated they needed to check Melcher's body to make sure no identification was left on him. He asked McNight to bring a meat cleaver to sever the head and hands from the body so there could be no identification. McNight and Appellant returned to the scene of the crime and McNight waited in the car. In a short while, Appellant returned to the car with Melcher's severed head and hands in a plastic bag. Appellant denied this testimony. There was testimony from Shannon Caccaveri that she came to Appellant's home to visit him that night and that Appellant left his residence about 4:30 a.m., after having called McNight. She stated Appellant was gone for approximately thirty to forty minutes. Appellant testified that he called McNight only to obtain some marijuana cigarettes. He said he met McNight at Terpstra's parking lot, went back to McNight's house where they both smoked marijuana cigarettes, and Appellant then returned home.

The State qualified a Lake County Police Officer, William Wirtz, as a tool mark expert. Wirtz testified that the right work boot taken from Appellant's garage and identified as Appellant's was the only possible boot that could have made the footprint shown in the cast made by the police at the crime scene. He also testified rubber soles from the cut-up tennis shoes owned by Appellant could have made the footprints shown in the other plaster cast made by police at the crime scene. A green towel containing blood stains also was found at Appellant's residence. The State qualified Larry Huys, an employee of the Northwest Indiana Criminal and Toxicology Laboratory, as a forensic serologist. Huys testified that less than one per-cent of the population has all of the genetic characteristics found in Melcher's blood. The green towel possessed three of these four genetic characteristics. Approximately ten per-cent of the population share these three genetic characteristics in their blood.

## I

In his Motion to Correct Error, Appellant, for the first time, requested the trial court to appoint expert witnesses at public expense to assist him in preparing a defense to testify on his behalf. He also claimed ineffective assistance of counsel in not providing for expert witnesses to examine the work boots, tennis shoes, and towel. Appellant now claims the trial court erred in denying the motion on both these grounds.

■ Appointment of an expert witness for an indigent is left to the sound discretion of the trial judge. *Lowery v. State* (1985), Ind., 478 N.E.2d 1214, 1220, *reh. denied* (1985); *Himes v. State* (1980), 273 Ind. 416, 418, 403 N.E.2d 1377, 1378. In *Himes,* this court stated:

"The determination must be made in the context of the case and we are of the opinion that only a clear abuse of that discretion will move as a denial of due process."

Furnishing of an expert is not required where the purpose of the examination appears to be exploratory only. *Himes,* 273 Ind. at 419, 403 N.E.2d at 1378. In 1953, the United States Supreme Court held that in *Smith v. Baldi* (1953), 344 U.S. 561, 568, 73 S.Ct. 391, 395, 97 L.Ed. 549, 556, that an indigent has no constitutional right to the appointment of an expert at State expense. More recently, the United States Supreme Court, in *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53, 66, found it was error not to appoint a psychiatrist to assist the defendant in preparation of his defense where the facts show the defendant desired to interpose an insanity defense. No experts, either for the defense or the State, had examined the defendant on the issue of his insanity at the time of the offense. The Supreme Court explicitly distinguished *Ake* from *Smith v. Baldi,* and *McGarty v. Smith* (1st Cir.1951) 188 F.2d 151, on the basis of availability of other witnesses. *Ake,* 470 U.S. at 86, 105 S.Ct. at 1098, 84 L.Ed.2d at 67. The Court did list a number of factors in *Ake* that led to its holding:

"For one, Ake's sole defense was that of insanity. Second, Ake's behavior at arraignment, just four months after the offense, was so bizarre as to prompt the trial judge, *sua sponte*, to have him examined for competency. Third, a state psychiatrist shortly thereafter found Ake to be incompetent to stand trial, and suggested that he be committed. Fourth, when he was found to be competent six weeks later, it was only on the condition that he be sedated with large doses of Thorazine three times a day, during trial. Fifth, the psychiatrists who examined Ake for competency described to the trial court the severity of Ake's mental illness less than six months after the offense in question, and suggested that this mental illness might have begun many years earlier. App. 35. Finally, Oklahoma recognizes a defense of insanity, under which the initial burden of producing evidence falls on the defendant. Taken together, these factors make clear that the question of Ake's sanity was likely to be a significant factor in his defense.

In addition, Ake's future dangerousness was a significant factor at the sentencing phase. The state psychiatrist who treated Ake at the state mental hospital testified at the guilt phase that, because of his mental illness, Ake posed a threat of continuing criminal violence. This testimony raised the issue of Ake's future dangerousness, which is an aggravating factor under Oklahoma's capital sentencing scheme, Okla.Stat.Tit. 21, § 701.12(7) (1981), and on which the prosecutor relied at sentencing. We therefore conclude that Ake also was entitled to the assistance of a psychiatrist on this issue and that the denial of that assistance deprived him of due process."

*Ake,* 470 U.S. at 86–87, 105 S.Ct. at 1098–1099, 84 L.Ed.2d at 68.

■ Facts here are not comparable to those of *Ake.* First, Appellant gave the court no opportunity to consider this question during trial. Second, the fact situation is much different here. There was direct testimony from McNight and other wit-

nesses involving Appellant in this crime. The testimony of these experts involved precise, physical measurements and chemical testing, and there is no showing that these experts were less than precise or able in their testing and observations, that the truth or accuracy of their testimony is questionable by some new evidence, or that there is evidence available or likely from other experts which would indicate they were wrong. The State correctly points out that Appellant seeks exploratory investigation with no inference of its probable results. The trial court did not abuse its discretion in denying this motion.

■ Appellant claims trial counsel was ineffective since he failed to call expert witnesses to refute those of the State, and that he was so prejudiced thereby that it is reversible error. Trial counsel filed an affidavit in response to Appellant's in the motion to correct errors, in which Counsel stated: "I saw no need to obtain expert testimony pertaining to shoe prints at the scene since at no time did Arden C. Schultz deny that these prints were, in fact, his own." Counsel also stated it was his strategy to attack the credibility of McNight, and he directed the defense in that direction. Appellant concedes the proper standard of review for incompetence of counsel is based on the holding of *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh. denied* (1984), 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864:

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the sixth amendment. Second, the defendant must show that the deficient-performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a

trial whose result is reliable.... *Strickland, supra* 104 S.Ct. at 2064."

*King v. State* (1984), Ind., 467 N.E.2d 726, 729; *See also Ford v. State,* (1985), Ind., 479 N.E.2d 1307, 1309. A criminal defense attorney in Indiana is presumed competent. Appellant here has failed to overcome this presumption. *Ford,* Ind., 479 N.E.2d at 1309.

## II

■ In his Motion to Correct Error, Appellant claimed his conviction should be set aside since the Prosecutor had failed to inform the defense of pending charges against two State's witnesses. There was a discovery order binding on both parties which, among other things, required the Prosecutor to produce, "... any material or information which would affect the credibility of prosecution witnesses." In response to Appellant's Motion to Correct Error, the Prosecutor did file an affidavit in which he stated that at the time of the State's witnesses giving their testimony, James E. Lakatos was charged with theft, and James E. Steenson was charged with driving while intoxicated, driving while suspended, and driving left of center. This information had not been made available to Appellant during the trial. It was shown further that the charges against Mr. Steenson were dismissed on March 30, 1982, and the charges against Mr. Lakatos were dismissed by the State on January 24, 1984. Appellant cites us to *Richard v. State* (1978), 269 Ind. 607, 382 N.E.2d 899, which was based on a United States Supreme Court case of *United States v. Agurs* (1976), 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342. Appellant claims the information withheld by the Prosecutor, "might have affected the outcome of the trial." This is the test for a Type II withholding of information under *Agurs,* and *Richards,* where the defendant has made a pre-trial request for *specific* information. A "Type III" withholding of information in the face of a general request or of no request at all provides for a less strict standard of review, that the Prosecutor's duty to disclose is measured by whether the evidence in his

possession was so "obviously exculpatory" that his failure to turn it over denied the defendant a fair trial. *Richard*, 269 Ind. at 614, 382 N.E.2d at 904.

Here, the testimony of Lakatos and Steenson was brief and merely corroborative of Stanley McNight's testimony. The State filed an affidavit stating that no deal was made with either witness. Appellant does not refute this. Therefore, the pending charges against these witnesses could not have been used for impeachment. *Ashton v. Anderson* (1972), 258 Ind. 51, 57, 279 N.E.2d 210, 213. Appellant does not allege, nor does he show, that the State purposefully withheld this information or tried to conceal it, and, in fact, alleges the charges against these two witnesses were a matter of public record. Appellant has shown neither that the outcome of the trial might have been different had this information been given to the defense, nor that such information was so obviously exculpatory that the State was obligated to furnish it. Appellant therefore shows no prejudice justifying reversal.

### III

 Finally, Appellant claims the trial court erred by refusing to sequester the jury. In a non-capital case, a defendant is not entitled to reversal because his motion for jury sequestration was denied, unless he demonstrates that the trial court abused its discretion. *Smith v. State* (1985), Ind., 474 N.E.2d 973, 977–978. The only grounds given for Appellant's contention that the jury should have been sequestered is that there was a great amount of media coverage. The record shows that when Counsel made his request for sequestration early in the trial and during *voir dire*, the trial court observed that at least ten of the prospective jurors seated had no knowledge or recollection of the case. One or two had read or heard something about the case when the body was discovered some eighteen months before, and had no specific recollection of any of the details of the articles. The court then stated that the motion would be denied, but that the court would make daily inquiry of anything specifically directed to publicity concerning the matter, and, depending on the results of that inquiry, would take whatever steps were necessary to correct the problem. The court did make inquiry of the jury from time to time, and there is no showing that the jurors were exposed to, or affected by any, publicity. There was no further motion to sequester the jury for the balance of the trial. No reversible error is presented on this issue. *Id.; Cobb v. State* (1981), 274 Ind. 342, 348, 412 N.E.2d 728, 732, *reh. denied* (1981).

The trial court is in all things affirmed.

GIVAN, C.J., and DeBRULER, SHEPARD and DICKSON, JJ., concur.