James P. HARRISON, Appellant,
(Defendant Below),

v.

STATE of Indiana, Appellee,
(Plaintiff Below).

No. 65S00–9105–DP–380.

Supreme Court of Indiana.

Jan. 4, 1995.

William H. Bender, Allyn, Givens & Bender, Poseyville, for appellant.

Pamela Carter, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Justice.

We review and affirm the murder convictions of defendant James P. Harrison. We remand for a more specific sentencing order by the trial court.

*Facts*

In 1988, the defendant met Stacy Forsee at church in Mount Vernon, Indiana. On January 17, 1989, about 3:45 a.m., firemen were called to a fire at her home in Mount Vernon. The dead bodies of Stacy Forsee and her two children, daughter Tia Forsee, age 3½, and son Jordan Hanmore, age 21 months, were found in the home. Autopsies showed that Stacy Forsee had been stabbed to death prior to the fire breaking out. Semen was found in her mouth. Tia Forsee died from burns suffered during the fire. Jordan Hanmore died from smoke inhalation.

Charges were not filed until over two years later, and defendant was then arrested in Baltimore, Maryland. He was charged with Arson,[1] the knowing Murder[2] of Stacy Forsee, the knowing Murder[3] of Tia Forsee, and the Felony Murder[4] of Jordan Hanmore. The State also charged defendant with being an Habitual Offender[5] and sought the death penalty.[6] As the aggravating circumstances justifying the death penalty, the State charged that two of the victims, Tia Forsee and Jordan Hanmore, were less than twelve years of age,[7] that Jordan Hanmore had been intentionally killed during the commission of arson,[8] and that defendant had previously been convicted in 1973 of another murder in Virginia.[9]

At trial, evidence was presented that: (i) defendant regularly carried a hunting knife (although no knife was introduced into evidence); (ii) defendant was observed near the fire scene on the night of the murders before fire trucks arrived; (iii) defendant had purchased kerosene several days before the murders; (iv) the fire had been started by a flammable liquid; and (v) defendant had told fellow inmates in a Maryland jail that he had committed the crimes. During trial, the court admitted into evidence the results of DNA analysis performed by two separate laboratories using swabs taken from Stacy Forsee's mouth and defendant's blood.

A jury convicted defendant of Arson, the knowing Murder of Tia Forsee, and the Felony Murder of Jordan Hanmore. It acquitted defendant of the knowing Murder of their mother, Stacy Forsee. During the subsequent habitual offender phase of the trial, the jury convicted defendant of being an Habitual Offender. Following the death penalty phase of the trial, the jury recommended that defendant be sentenced to death for each of the murders of Tia Forsee and Jordan Hanmore.

At a subsequent sentencing hearing, the trial court sentenced defendant to death for each of the murders of Tia Forsee and Jordan Hanmore. Defendant appeals his convictions for Murder and his death sentences. He does not appeal his conviction for Arson.

We shall provide additional facts as necessary.

*Issues On Appeal*

1. *Inconsistent Verdicts.*

Defendant argues that because the jury acquitted him of the murder of Stacy Forsee, reasonable doubt exists as a matter of law that the he possessed the required *mens rea* to be guilty of the murder of her children. The defendant claims, therefore, that there was insufficient evidence to convict him of

1. Ind.Code § 35–43–1–1(a)(1) (1988).

2. Ind.Code § 35–42–1–1(1) (1988).

3. *Id.*

4. Ind.Code § 35–42–1–1(2) (1988).

5. Ind.Code § 35–50–2–8 (1988).

6. Ind.Code § 35–50–2–9 (1988).

7. Ind.Code § 35–50–2–9(b)(12) (1988) (currently Ind.Code § 35–50–2–9(b)(11) (1993)).

8. Ind.Code § 35–50–2–9(b)(1) (1988) (currently Ind.Code § 35–50–2–9(b)(1)(A) (1993)).

9. Ind.Code § 35–50–2–9(b)(7) (1988).

the murders of Tia Forsee and Jordan Hanmore. Br. of Appellant at 14. It is true that a *mens rea* of either knowledge or intent is an essential element constituting the crime of Murder in Indiana. Ind.Code § 35–42–1–1(1) (1988); *Vance v. State* (1993), Ind., 620 N.E.2d 687, 690; *Abdul–Wadood v. State* (1988), Ind., 521 N.E.2d 1299, 1300, *reh'g denied.* "[T]he Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *Bellmore v. State* (1992), Ind., 602 N.E.2d 111, 126, *reh'g denied; Smith v. State* (1984), Ind., 459 N.E.2d 355, 357. But defendant cites no authority for his specific argument here that the fact of the acquittal of the murder of Stacy Forsee means that the State failed to meet its burden of proof of the required *mens rea* to convict defendant of the murders of Tia Forsee and Jordan Hanmore.

We reject defendant's contention for several reasons.

■ First, proof of the intent necessary to convict defendant of the murders of the children was in no way dependant upon the intent necessary to convict him of the murder of their mother. Stacy Forsee died from multiple stab wounds. The children, however, died from the fire defendant was convicted of setting, a conviction the sufficiency of the evidence with respect to which the defendant does not contest. There was substantial physical evidence with the respect to the place where the fire started from which the jury could infer that defendant knowingly killed Tia Forsee. A pathologist and State Fire Marshall investigators testified that the fire started in Tia Forsee's bedroom. As to Jordan Hanmore, because the charge was felony murder, no intent beyond the intent to commit the underlying felony of arson need

be proven. *Martinez Chavez v. State* (1989), Ind., 534 N.E.2d 731, 738, *reh'g denied* (1989), Ind., 539 N.E.2d 4. As noted, defendant does not contest the sufficiency of the evidence with respect to the arson charge. Thus, irrespective of whether defendant knowingly or intentionally killed Stacy Forsee, there was sufficient evidence from which a jury could infer the required *mens rea* to convict defendant of the murders of the children.

■ Second, defendant's argument assumes that the acquittal of defendant on the charge of murdering Stacy Forsee implies as a matter of law that the State did not prove the required *mens rea* beyond a reasonable doubt. Such is, of course, not the case. The jury's verdict on this charge could have resulted from the failure of the State to meet its burden of proof on any element of the offense, not just on the *mens rea* element. As the State observes, defendant's argument is essentially that the verdicts are inherently and impermissibly inconsistent. While this court does review verdicts to determine whether they are consistent, perfect logical consistency is not demanded and only extremely contradictory and irreconcilable verdicts warrant corrective action by this court. *Hoskins v. State* (1990), Ind., 563 N.E.2d 571, 577; *Townsend v. State* (1986), Ind., 498 N.E.2d 1198; *see also United States v. Powell,* 469 U.S. 57, 67, 105 S.Ct. 471, 478, 83 L.Ed.2d 461 (1984) (holding that sufficiency of evidence review should be independent of jury's determination that evidence on another count was insufficient). Here we cannot conclude that the verdicts are inconsistent. The verdict in the mother's death can be reconciled with the verdicts in the children's deaths on the basis that the jury may have found a failure of proof as to stabbing while finding the proof related to the fire sufficient.[10]

---

10. The State concedes that the evidence that defendant killed Stacy Forsee by stabbing her was not as strong as the evidence that he set the fire.

 The State presented evidence that Defendant had a hunting knife which disappeared around the time of the crimes, and attempted by DNA

analysis to show that it was Defendant's semen in swabs taken from Stacy Forsee's mouth. The jury, however, could have felt that they could not be certain beyond a reasonable doubt that it was Defendant—and not someone else—who stabbed Stacy Forsee to death. Br. of Appellee at 13.

### 2. *Denial of Motion for Change of Venue.*

■ Defendant contends that the trial court abused its discretion in denying his motion for a change of venue from the county, asserting that extensive pre-trial publicity precluded his opportunity to receive a fair and impartial trial. In support of this motion, defendant filed videotapes from the news media, audio cassettes from a local radio station, and certain other exhibits.

■ To prevail on appeal, defendant must show, in addition to the existence of prejudicial pre-trial publicity, that the jurors were unable to set aside their preconceived notions of guilt and render a verdict based upon the evidence. *Burdine v. State* (1987), Ind., 515 N.E.2d 1085, *reh'g denied.* A review of the record of the *voir dire* proceedings shows that every juror who indicated an inability to put aside prior knowledge of the case, gained through the media, from discussions with other persons, or from any other source, was excused. Defendant has not specified any juror as being unable to put aside any prior knowledge of the case and did not seek to challenge any juror for cause on this basis. It also appears from the record that defendant did not use all of his peremptory challenges during the jury selection process. *See Kappos v. State* (1984), Ind., 465 N.E.2d 1092. No showing has been made, therefore, that the jurors were unable to set aside any preconceived notions of guilt and render a verdict based upon the evidence.

### 3. *Denial of Motion for Change of Judge.*

■ Defendant contends that he was denied a fair and impartial trial because of the denial of his motion for a change of venue from judge. A ruling for a change of judge in a criminal proceeding is within the trial court's discretion. We review such a ruling only for a clear abuse of discretion. *Stidham v. State* (1994), Ind., 637 N.E.2d 140, 142; *Harrington v. State* (1992), Ind., 584 N.E.2d 558, 561 (per curiam). Here, defendant states no facts in his brief before this court, nor can we find any in the record, that indicate that there was an undisputed claim of prejudice or that the trial court expressed an opinion on the merits of the controversy. Moreover, defendant makes no argument and points to no authority on this issue in his brief before this court. He says simply that the issue is "raised for purposes of preserving [it] for further appeal." Under these circumstances, we cannot say that the trial court abused its discretion in denying defendant's motion for change of venue from judge.

### 4. *Refusal to Ask Voir Dire Questions.*

■ During *voir dire* the trial court limited each side to twenty minutes of questioning for each configuration of fourteen jurors, in addition to the court's general *voir dire* questioning. When defendant submitted a list of tendered questions for *voir dire,* the court declined to ask those questions.

We first observe that this court has frequently upheld limitations of twenty minutes per side during *voir dire* examinations.[11] However, since 1987 the trial court's conduct in this regard has been governed by Indiana Trial Rule 47(D):

> **Examination of Jurors.** The court shall permit the parties or their attorneys to conduct the examination of prospective jurors, and may conduct the examination itself. The court's examination may include questions, if any, submitted in writing by any party or attorney. If the court conducts the examination, it shall permit the parties or their attorneys to supplement the examination by further inquiry. The court may impose an advance time limitation upon such examination by the parties or their attorneys. At the expiration of said limitation, the court shall liberally grant additional reasonable time upon a showing of good cause related to the nature of the case, the quantity of prospective jurors examined and juror vacancies remaining, and the manner and

---

**11.** *E.g., Gossmeyer v. State* (1985), Ind., 482 N.E.2d 239, 241; *Wickliffe v. State* (1981), Ind., 424 N.E.2d 1007, 1008; *Lynn v. State* (1979), 271 Ind. 297, 298–99, 392 N.E.2d 449, 451; *Hart v. State* (1976), 265 Ind. 145, 151, 352 N.E.2d 712, 716; *see also Linder v. State* (1985), Ind., 485 N.E.2d 73, 77 (upholding a 35 minute per side limitation in a death penalty case in the same trial court), *post-conviction relief granted on other grounds* (1992), Ind.App., 589 N.E.2d 1188.

content of the inquiries and responses given by the prospective jurors. The court may prohibit the parties and their attorneys from examination which is repetitive, argumentative, or otherwise improper but shall permit reasonable inquiry of the panel and individual jurors.

As we understand what happened in this case, defendant tendered a list of questions to the trial court for the court to ask because defendant found the twenty minute limit too restrictive. While Trial Rule 47(D) certainly permits this approach, defendant was also entitled to a liberal grant of additional time for questioning upon making the showings required by the rule. Because the State was seeking the death penalty and because the trial court refused to ask defendant's tendered questions, defendant would have been entitled to more than twenty minutes of *voir dire* per configuration had he requested more time in accordance with Trial Rule 47(D). However, defendant does not contend that Trial Rule 47(D) was violated and so has shown no error.

### 5. *Denial of Motions Regarding DNA Testing.*

Defendant contends that the trial court committed reversible error by denying several motions regarding the admission of DNA testing results.

Investigators submitted oral and vaginal swabbings taken from Stacy Forsee to Cellmark Laboratories for DNA "fingerprinting." The State hoped that genetic coding material (DNA) derived from semen in these swabbings could be used to identify the perpetrator. Cellmark used a testing procedure called restriction fragment length polymorphism (RFLP). However, Cellmark was unable to identify any male DNA from the samples; the only DNA identified was that of the victim.

Near the date of trial, Cellmark personnel advised the State of a different type of DNA

test called polymerase chain reaction (PCR) which Cellmark felt might be able to be performed on the samples. Cellmark itself did not perform PCR tests and referred the State to two laboratories, including Genescreen in Dallas, Texas.

At a pre-trial hearing on October 21, 1991, the State advised the court and the defense of its desire to have the new test performed. It was highly uncertain at this point whether the results could be obtained before trial. The record suggests that at this hearing the State agreed that it would dismiss charges against the defendant if the test excluded him (although the record can be read to the effect that the State only agreed to dismiss if DNA fingerprinting specifically excluded him), that the defense wanted the new test performed and agreed to the admissibility of the results (although the record can be read to the effect that the defense only agreed to have the tests conducted), and that the trial court overruled a defense request for an expert to interpret the results, holding that Genescreen personnel were sufficiently neutral to provide the defense with any expert assistance it required.

On November 4, 1991, the State reported to the trial court that Genescreen had been successful in extracting male DNA from the sample sent it, and that defendant's "blood matched the sperm that was found on the swab excluding 90.2 percent of the population." Contemporaneously, defendant moved for a continuance, renewed its motion for an expert to permit it to analyze the DNA test results independently, and filed a motion *in limine* to prohibit reference to the PCR tests "until a *Frye* hearing [could] be conducted to assess the reliability of this novel scientific evidence."[12] Even though the State specifically said it had no objections to the *Frye* hearing, the trial court summarily denied all these motions, agreeing with the State that

---

12. A *"Frye"* hearing is named after the pre-trial hearing required in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), to determine whether the scientific methodology supporting proffered expert testimony is "sufficiently established to have gained acceptance in the particular field in which it belongs" and whether expert testimony

based on that methodology is therefore admissible. *Id.* at 1015. The term *"Frye* hearing" is used by defendant, and we use it in this opinion, to refer to a generic hearing on the reliability of the proffered scientific evidence rather than to the legal standard to be applied in evaluating reliability. See note 15, *infra.*

defendant had agreed on October 21 to the admission of this evidence.

At trial, immediately before the Genes-creen and Cellmark personnel testified, defendant renewed his motions for continuance and appointment of expert. A lengthy colloquy followed during which the October 21 and November 4 discussions were reviewed and the defendant requested either to depose the DNA witnesses or conduct a "*Frye*-like" hearing where the witnesses would be under oath in the courtroom. The trial court refused: "As I understand the current case and the statutory law of Indiana, *Frye* hearings are not required. The fact is, they are not recommended." The trial court ultimately denied the motions, ruling that the defendant had requested the evidence and that the State had no advantage because it was relying on the same experts as the defendant. The trial court did order that the DNA witnesses be available to the defense for questioning during an approximately three hour lunch break.

At trial, Dr. Lisa Forman from Cellmark testified that its analysis had been unable to link defendant to the swabbings taken from Stacy Forsee. Analyst Judy Floyd from Genescreen testified that although its test had been able to exclude 92.6% of all white males as the source of the specimen, defendant had not been excluded. However, she acknowledged that of any 13,000 white men, the specimen could have come from any 1,000 of them.

██ As noted, defendant on October 21 and November 4 moved for appointment of an expert to assist him in analyzing the DNA test results. On November 4, the defendant also moved for a continuance to allow him more time to analyze the test results and filed a motion *in limine* to exclude the test results, at least until the trial court could conduct a "*Frye*" hearing on the admissibility of the test results. At trial, defendant renewed his motions for a continuance and appointment of expert and again raised the issue of holding a *Frye* hearing. While we believe the trial court should have conducted a *Frye* hearing, we ultimately conclude that any error in this regard does not require reversal.

Starting with *Hopkins v. State* (1991), Ind., 579 N.E.2d 1297, 1302, this court has regularly approved the admission of DNA identification evidence in criminal prosecutions.[13] But these cases do not stand for the proposition that any proffered DNA evidence is automatically admissible.[14] Rather, they reflect this court's conclusion that in each case, the trial court either properly applied the applicable rules of evidence in admitting the test results or did not commit error that was reversible. By summarily denying all defense motions without conducting any pretrial inquiry into the admissibility of the DNA tests, the trial court here ran serious risks of violating important evidentiary principles.

First, *Hopkins* involved the restriction fragment length polymorphism (RFLP) testing methodology. However, the DNA test at issue here employed the new methodology, polymerase chain reaction (PCR). The words "DNA test results" are not magic words which, once uttered, cause the doors of admissibility to open. Expert scientific testimony is admissible in Indiana only if the *court* is satisfied that the scientific principles upon which the expert testimony rests are reliable. *Cornett v. State*, (1983), Ind., 450 N.E.2d 498, 503; *Hopkins*, 579 N.E.2d at 1303. *Cf.* Ind.Evidence Rule 702(b). There was no effort by the trial court here to satisfy itself in this regard as to the new PCR type of DNA testing.[15]

**13.** *Jenkins v. State* (1993), Ind., 627 N.E.2d 789, *reh'g denied, cert. denied,* —— U.S. ——, 115 S.Ct. 64, 130 L.Ed.2d 21 (1994); *Lockhart v. State* (1993), Ind., 609 N.E.2d 1093, 1098; *Woodcox v. State* (1992), Ind., 591 N.E.2d 1019, 1026–27; *Davidson v. State* (1991), Ind., 580 N.E.2d 238, 243, *reh'g denied.*

**14.** This is so notwithstanding Indiana Code § 35–37–4–13 (1991 Supp.). Rules of procedure, including rules of evidence, established by this court prevail over any statute. Ind.Code § 34–5–2–1 (1988); *Hawkins v. Auto–Owners (Mutual) Ins. Co.* (1993), Ind., 608 N.E.2d 1358, 1359, *overruled on other grounds, Kimberlin v. DeLong* (1994), Ind., 637 N.E.2d 121, *reh'g denied.*

**15.** The standard to be used by Indiana courts in making such a determination in the past has been the subject of debate. *See Hopkins*, 579 N.E.2d at 1305 (Dickson, J., concurring with separate opinion in which Krahulik, J., concurs).

Second, by summarily dismissing the defense motions we believe the trial court failed to give proper attention to its obligation to determine that the expert witnesses were properly qualified. Our decision in *Hopkins* best illustrates this point. There we left for the factfinder the duty of evaluating the weight of expert testimony and resolving "[a]ny battle of qualified experts ... or other conflict as to the reliability of evidence." *Hopkins,* 579 N.E.2d at 1303. But we also clearly said that before any such testimony is to be presented to the jury, the trial court must rule "the witness qualified as a matter of law to give expert testimony regarding DNA analysis." *Id.* There was no such ruling here.

Third, no evidence is admissible if the danger of unfair prejudice to the defendant substantially outweighs the probative value of the evidence. *Hardin v. State* (1993), Ind., 611 N.E.2d 123, 126 (quoting *Warner v. State* (1991), Ind., 579 N.E.2d 1307, 1310, and *Hansford v. State* (1986), Ind., 490 N.E.2d 1083). This rule is now embodied in Indiana Evidence Rule 403.[16] This court has clearly recognized that scientific evidence presents special risks of "potential harm and prejudice to the parties involved." *Cornett,* 450 N.E.2d at 503. We agree with the recent pronouncement of the United States Supreme Court construing Federal Rule of Evidence 403: " 'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses.' " *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, —, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993) (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).[17] There is no evidence in this record that the trial court engaged in any such weighing.

Before expert scientific evidence may be admitted in Indiana, the trial court must be satisfied that the scientific principles upon which the expert testimony rests are reliable, that the witness is qualified, and that the testimony's probative value is not substantially outweighed by the dangers of unfair prejudice. By summarily denying defendant's motions without conducting any kind of hearing or making any kind of record on these issues, we have no basis for concluding that the trial court was satisfied in any of these respects.

As to the trial court's denial of defendant's motion for appointment of an expert and for a continuance to evaluate the DNA test results, we believe the trial court's rulings were within its discretion for the reasons to be discussed in a moment. However, we think that the because the defense was forced by these rulings to begin trial within only a few days of receiving the DNA test results and to rely on Genescreen personnel as its own experts, the trial court should have set aside time to permit the defense an in-depth inquiry into the tests. A pre-trial hearing could have been used for this purpose as well and presents an additional reason why the trial court should have conducted a pre-trial hearing on the admissibility of the test results.

■ We believe the trial court was within its discretion in denying the defendant's request for appointment of an expert to assist in analyzing the DNA tests. In a recent death penalty case we reviewed the standards for court-appointed experts for criminal defendants:

In Indiana, a criminal defendant is not constitutionally entitled, at public expense,

Effective January 1, 1994, Indiana Evidence Rule 702 and related principles control.

**16.** Indiana Evidence Rule 403, effective January 1, 1994, provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**17.** *Cf. In re: Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 746 (3d Cir.1994) (indicating that the language quoted from *Daubert* "does not change our opinion that in order for a district court to exclude scientific evidence, there must be something *particularly* confusing about the scientific evidence at issue—something other than the general complexity of scientific evidence").

to any type or number of expert witnesses he desires to support his case. *Kennedy v. State* (1991), Ind., 578 N.E.2d 633, 640, *cert. denied* 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521 [1992]. A defendant who requests funds for an expert witness has the burden of demonstrating the need for that expert. *Id.* The appointment of experts is left to the sound discretion of the trial court, and only an abuse of that discretion will result in a reversal, but a trial court must provide a defendant access to experts where it is clear that prejudice will otherwise result. *Id.* Issues which the trial court should consider in determining whether a defendant is entitled to funds for an expert include (1) whether defense counsel already possesses the skills to cross-examine the expert adequately or could prepare to do so by studying published writings, *Id.;* (2) whether the purpose of the expert is exploratory only, *Hough v. State* (1990), Ind., 560 N.E.2d 511, 516; and (3) whether the nature of the expert testimony involves precise physical measurements and chemical testing, the results of which were not subject to dispute. *Schultz v. State* (1986), Ind., 497 N.E.2d 531, 533–34. In cases where a defendant faces the death penalty, we also have held that the failure to allow the defendant appropriate resources to retain an expert who would give an opinion concerning the statutory mitigator, may require reversal of the death penalty. *Castor v. State* (1992), Ind., 587 N.E.2d 1281, 1288 [, *reh'g denied* ].

*James v. State* (1993), Ind., 613 N.E.2d 15, 21. We believe that in this case the nature of the expert testimony involved precise physical measurements and chemical testing, the results of which were not subject to dispute, and so the rule of *Schultz v. State* (1986), Ind., 497 N.E.2d 531 applies. Where the testimony of the experts involved "precise, physical measurements and chemical testing, and there is no showing that these experts were less than precise or able in their testing and observations, that the truth or accuracy of their testimony is questionable by some new evidence, or that there is evi-

dence available or likely from other experts which would indicate they were wrong," the trial court did not abuse its discretion in denying a motion for appointment of an expert. *Schultz,* 497 N.E.2d at 534. Here there was every reason to believe that the Genescreen personnel were neutral.[18] Defendant made no attempt to question their precision, ability, truth or accuracy, nor did he make any showing which could reasonably lead to an indication that they were wrong. In applying this holding in future cases, however, it will be incumbent upon trial courts to assure that such experts are truly neutral— that the experts are aware that they are not advocates for either side and that neither side has any material advantage as to pretrial access to them or to test results or materials.

Defendant relies on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and *Smith v. McCormick,* 914 F.2d 1153 (9th Cir.1990). In *Ake,* the Supreme Court reversed a conviction because the appointment of an expert in psychiatry was denied to an indigent defendant relying on an insanity defense. In *Smith,* a panel of the Court of Appeals for the Ninth Circuit rejected the appointment of a "neutral" psychiatrist and held that the defendant should have had independent psychiatric assistance.

We agree with the State that defendant's situation here is different from that in *Ake* and *Smith.* Psychiatry is an extremely uncertain field dealing with the mysteries of the human mind where expert opinions can be expected to and do differ widely. In contrast, the neutral Genescreen experts here were testifying to the results of a test "involving precise, physical measurements and chemical testing," *James,* 613 N.E.2d at 21 (citing *Schultz,* 497 N.E.2d at 533–34). Under these circumstances, the trial court did not abuse its discretion by denying appointment of defendant's requested expert.

■■■■ As to the denial of the motions for continuance, we make several observations. The granting or denial of a continuance is primarily a matter for the trial court,

---

**18.** There was testimony to the effect that Genescreen was a private company, not a law enforcement agency, and that its services were available to prosecution and defense clients.

and the denial of one will be reviewed only for an abuse of discretion.[19] *Woods v. State* (1989), Ind., 547 N.E.2d 772, 788, *reh'g granted on other grounds* (1990), Ind., 557 N.E.2d 1325, *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (1991). The record must reveal that the defendant was prejudiced by the failure to grant the continuance in order to demonstrate an abuse of discretion. *Evans v. State* (1986), Ind., 489 N.E.2d 942, 948.

Here, the reason the continuance was requested was to permit the requested defense expert to review the results of the Genescreen test. Because it was within the trial court's discretion to deny appointment of the underlying expert, we perceive no abuse in the court's denial of the continuance that was sought to permit that expert time to work.

■ Likewise, we find no reversible error in the trial court's admission of the DNA test results. First, the record suggests that defense counsel consented to the admission of the test results at the October 21, 1991, pretrial conference. In any event, defendant did not renew his objection to the admission of the test results embodied in his motion *in limine.*[20] The issue was therefore waived for appeal. *Conner v. State* (1991), Ind., 580 N.E.2d 214, 219, *cert. denied,* 503 U.S. 946, 112 S.Ct. 1501, 117 L.Ed.2d 640 (1992); *Col-*

*lins v. State* (1984), Ind., 464 N.E.2d 1286, 1289–90.

■ Second, the DNA test results were of primary importance to only one of the charges—the knowing murder of Stacy Forsee—and defendant was acquitted of this crime. In fact, from our reading of the record, it would appear that the jury may very well have acquitted on this charge based in part on defense counsel's effective cross-examination of the Cellmark and Genescreen technician.[21] As noted in the discussion of Issue No. 1, *supra,* there existed substantial independent evidence apart from the DNA test results to support the convictions for Arson and the Murders of the children. Exclusion of the DNA test results would not have affected the sufficiency of the evidence supporting those convictions.

### 6. *Restriction on Alibi Testimony.*

Defendant contends that the trial court committed reversible error by restricting his ability to present alibi testimony. After defendant filed a notice of alibi, the prosecution filed a motion *in limine* seeking to exclude alibi evidence. Following a hearing, the trial court granted the State's motion.

■ We find no error here for two reasons. First, defendant did not file his notice of alibi until long after the deadline imposed

---

**19.** Indiana Code § 35–36–7–1 (1988) sets forth certain statutory bases entitling defendant to a continuance. However, defendant here does not claim any statutory violation.

**20.** We acknowledge that defendant did renew at trial his motions for a continuance and for the appointment of an expert. Were it not for the second reason set forth below, we might well have held that these motions were sufficient to preserve defendant's objection to admissibility.

**21.** *Cross-examination of Judith I. Floyd of Genescreen by Defense Counsel:*
> XQ: So as I understand it from your testimony, the sperm cells that you found, that you attribute to being in Ms. Forsee's mouth, right?
> A: Right.
> XQ: One thousand out of every ten thousand, approximately, North American men fall into the category.
> A: Approximately if you are including black and white.
> XQ: That is right.

A: Correct.
> XQ: And if you were just including white, out of every thirteen thousand, there would be a thousand men that would fall in that category?
> A: Approximately, that is correct.

*Cross-examination of Dr. Lisa Forman of Cellmark of Genescreen by Defense Counsel:*
> XQ: ... In your first test you had no match with James Harrison.
> A: That is right.
> XQ: In your second test, you weren't interested in James Harrison, you were running the victim against the unknown?
> A: That is right. The unknown was already run, and we were comparing the victim's standard to that banding pattern.
> XQ: So from your test, your conclusion was that you had no match with James Harrison?
> A: That is right.

by Indiana Code § 35–36–4–3(b) (1988).[22] In fact, the notice was not filed until two days before trial. While we do not disagree with the defendant when he contends that the deadlines imposed in the alibi notice statute cannot be enforced so as to deny a defendant due process of law and a fair trial, we find nothing unreasonable in the trial court's restrictions on the eleventh hour alibi defense presented here. Not only was the prospect of an alibi defense not offered until the last minute, the defendant gave no reason for the delay, and the only information in the alibi notice was that the defendant was at his residence on the date of the crime. In similar circumstances we have held it proper to exclude alibi evidence. *See Adkins v. State* (1989), Ind., 532 N.E.2d 6, 8; *Baxter v. State* (1988), Ind. 522 N.E.2d 362, 369, *reh'g denied.*

■■■ Second, while there were two hearings during which the alibi issue was discussed, on neither occasion did the trial court prohibit the introduction of alibi evidence. Instead, the trial court ordered the defense to seek the court's permission outside the presence of the jury before doing so. On appeal, the defendant does not contend that he sought such permission and we find no evidence in the record that he did so. In *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, *reh'g denied, cert. denied,* 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986), we held that when the trial court grants the State's motion *in limine* and the defendant fails to make an offer of proof during trial, the defendant has not preserved for appellate re-

view any alleged error pertaining to that evidence. *Id.* at 93.

### 7. *Defendant's statements to investigating officers.*

Defendant claims infringement of his Fifth Amendment right to counsel as a result of the admission at trial of his statements to police on three occasions—on January 18 and 19, 1989, and on April 4, 1990. At trial, two Indiana State Police detectives and the City of Mount Vernon Police Chief testified as to their roles in the murder investigation, including their questioning of the defendant on those dates.[23]

■■■ Defendant offers no specifics to support his claim that the January, 1989, statements should have been suppressed, and we are unable to discern any basis for it. Defendant does not contend that he was in custody during this questioning, and the record indicates that he was not in custody and was free to go at the end of the questioning. *Miranda* safeguards apply only to custodial interrogation, *Oregon v. Mathiason,* 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977) (per curiam), *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), and are not applicable to general questioning in a non-coercive atmosphere. *Pasco v. State* (1990), 563 N.E.2d 587, 593.[24] All questioning appears to have ceased upon defendant's request for counsel on January 20; defendant does not contend to the contrary. The trial court conducted a suppression hearing and concluded that there was no *Miranda* violation. We agree.

---

**22.** Indiana Code § 35–36–4–1 (1988) requires a defendant in a felony prosecution to file notice of any alibi defense twenty days before the "omnibus date." The omnibus date in a felony prosecution is a date specified by the trial court no earlier than forty-five days and no later than seventy-five days after the completion of the initial hearing (unless the prosecuting attorney and the defendant agree to a different date). Ind. Code § 35–36–8–1 (1988). The purpose of the omnibus date is to establish a point in time from which various deadlines under this article are established. *Id.*

Defense counsel's principal argument at the motion *in limine* hearing was that because the trial court had failed to set an omnibus date, defendant's alibi notice was timely. While the trial court did apparently fail to set an omnibus

date, seventy-five days from the date of the initial hearing was July 13, 1991. Defendant did not file his notice until November 4, 1991.

**23.** None of defendant's statements to these law enforcement officers constituted a confession.

**24.** Custodial interrogation refers to questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714; *Pasco,* 563 N.E.2d at 593. To be custodial in the non-arrest context, the interrogation must commence after a person has been deprived of freedom of action has been deprived in any significant way. *Id.*

No further questioning of defendant occurred until April 4, 1990. This questioning was also non-custodial. Defendant argues that his statement to police should have been suppressed because it was taken in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). According to defendant, this violation occurred because he had requested a lawyer when questioned on January 20, 1989, and he was not provided with a lawyer when questioned again fifteen months later. We cannot agree.

*Edwards* requires that once the Fifth Amendment right to counsel has been asserted by the defendant, the defendant may not be further interrogated until counsel has been made available, unless the defendant initiates further communication and thereby knowingly and intelligently waives the right previously invoked. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85; *James*, 613 N.E.2d at 26. *Edwards*, like *Miranda*, only applies to custodial interrogation:

> The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.

*Edwards*, 451 U.S. at 485–86, 101 S.Ct. at 1885. Because the questioning in January, 1989, was not custodial interrogation, no *Edwards* rights were triggered that could have been violated at the questioning in the April, 1990.

### 8. *Admission of Certain Photographs.*

Defendant claims that it was reversible error for the trial court to admit State's exhibits 11 through 22. These exhibits consisted of photographs of the burned bodies of the three victims. We find nothing in the record indicating that defendant objected to the admission of these exhibits. By failing to object, defendant waived this issue. *Smith v. State* (1985), Ind., 475 N.E.2d 1139, 1144, *reh'g denied, post-conviction relief granted on other grounds* (1989), Ind., 547

N.E.2d 817. We do note, however, that defendant did object to the admission of exhibits 23 through 26, consisting of autopsy photographs of Stacy Forsee's stab wounds. Once it is established that a photograph is an accurate depiction of that which it is intended to portray, its admissibility turns on the question of relevancy. Photographs are relevant if they depict scenes that a witness is permitted to describe in their testimony. A relevant photo will be admitted into evidence unless its relevancy is outweighed by its tendency to inflame the passions of the jury. *Baird v. State* (1992), Ind., 604 N.E.2d 1170, 1189, *cert. denied,* —— U.S. ——, 114 S.Ct. 255, 126 L.Ed.2d 208 (1993); *Games v. State* (1989), Ind., 535 N.E.2d 530, *cert. denied,* 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 158 (1989). Although defendant claims that the "photographs could serve no purpose other than to inflame and prejudice the jury," Br. of Appellant at 22, they were in fact used to illustrate the testimony of a pathologist and so met the test of relevancy. Defendant makes no specific argument or showing as to how the relevancy of the photographs was outweighed by their tendency to inflame the passions of the jury. We have regularly held that such evidence is not unduly prejudicial, *e.g., Baird,* 604 N.E.2d at 1189, *Jackson v. State* (1992), Ind., 597 N.E.2d 950, 963, *reh'g denied, cert. denied,* —— U.S. ——, 113 S.Ct. 1424, 122 L.Ed.2d 793 (1993), *Kennedy v. State* (1991), Ind., 578 N.E.2d 633, 640, *reh'g denied, cert. denied,* 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521 (1992), *after remand,* (1993), Ind., 620 N.E.2d 17, *reh'g denied,* and do so here in the absence of any such argument or showing.

### 9. *Jury Selection Procedures.*

Defendant argues that the jury selection procedure employed in this case subjected him to an unfair trial. His argument appears to that it was impermissible under *Georgia v. McCollum,* —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), to exclude those potential jurors who were excused "because they stated that they would not consider the death penalty under any circum-

stances." [25] Br. of Appellant at 24. This argument reflects a misunderstanding of *McCollum.*

*McCollum* is one of a series of recent United States Supreme Court cases placing limits upon the practice of peremptory challenges to prospective jurors.[26] While it is true that *McCollum* refers to the rights of prospective jurors not to be denied participation in jury service, the jurors in that case were sought to be excluded because of their race, not their attitudes on the death penalty. In fact, the *McCollum* Court pointed out, "While '[a]n individual juror does not have a right to sit on any particular petit jury, ... he or she does possess the right not to be excluded from one on account of race.' " —— U.S. at ——, 112 S.Ct. at 2353 (quoting *Powers v. Ohio*, 499 U.S. 400, 409, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991)). This right arises under the equal protection clause contained in the Fourteenth Amendment to the United States Constitution. *Id.* Defendant does not cite, and we know of no authority for the proposition that prospective jurors unable to set aside their views about the death penalty to the extent described in note 25, *supra*, constitute any type of a classification entitled to heightened scrutiny for purposes of Fourteenth Amendment equal protection analysis.

### 10. *Other Issues on Appeal.*

Defendant also argues that (i) the trial court improperly permitted "victim impact" evidence; (ii) the trial court failed to consider properly the character of defendant and cir-

cumstances of his crime when invoking the death penalty; (iii) the trial court erred by finding and considering aggravating circumstances not supported by the evidence while failing to find and consider mitigating circumstances clearly supported by the evidence, and by applying the wrong standard to determine if the aggravating factors outweighed the mitigating factors in order to impose the death penalty; and (iv) the death penalty is unconstitutional. We consider these issues below, the fourth under the heading "Constitutionality of the Death Penalty" and the first three under the caption "Death Sentence Review."

### Constitutionality of the Death Penalty

Defendant challenges on multiple grounds the constitutionality of the death penalty. He acknowledges that the Indiana death sentencing scheme has been upheld in the face of such challenges in the past but apparently wishes to preserve these issues for federal review.

### a. *Constitutionality Per Se.*

■ Acknowledging that firmly established precedent is to the contrary, defendant nevertheless contends that "the killing of convicts by any means is always unconstitutional due to the suffering and degradation inherent in the very act of taking away a life, the arbitrariness with which the ultimate penalty is imposed and the availability with which the ultimate penalty is imposed and the punishments which lack the severity of death." Br. of Appellant at 33. Defendant's

---

**25.** "Prospective jurors unable to set aside their views about the death penalty that would 'prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instructions and [their] oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)), may be removed for cause according to the guidelines set out in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as refined by the decision in *Witt.* Defendant does not maintain that these guidelines were violated in this case.

**26.** *J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (forbidding gender discrimination in the exercise of peremptory challenges); *Georgia v. McCollum*,

—— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (forbidding racial discrimination in the exercise of peremptory challenges by criminal defendants); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (forbidding racial discrimination in the exercise of peremptory challenges in civil cases); *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (forbidding racial discrimination in the exercise of peremptory challenges by criminal prosecutors where defendant was white and challenged jurors were black); *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (forbidding racial discrimination in the exercise of peremptory challenges by criminal prosecutors where defendant and challenged jurors were black).

argument has been frequently analyzed at length and rejected, both by the United States Supreme Court and by our own court. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 168, 96 S.Ct. 2909, 2922–23, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *Brewer v. State* (1981), 275 Ind. 338, 346–47, 417 N.E.2d 889, 894, *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982), *reh'g denied*, 458 U.S. 1132, 103 S.Ct. 18, 73 L.Ed.2d 1403 (1982), *denial of post-conviction relief aff'd* (1986), Ind., 496 N.E.2d 371, *cert. denied*, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987), *conditional grant of writ of habeas corpus aff'd, Brewer v. Shettle*, 917 F.2d 1306 (7th Cir.1990), *opinion issued, Brewer v. Aiken*, 935 F.2d 850 (7th Cir.1991). We reaffirm that the Indiana death penalty statute is constitutional.

#### b. *Vindictive Justice.*

 Defendant contends that while, as a matter of federal constitutional law, retribution is a proper justification for the death penalty, *Gregg*, 428 U.S. at 183, 96 S.Ct. at 2929–30, it is an impermissible justification in Indiana because our constitution provides that our "penal code shall be founded on principles of reformation, and not vindictive justice." Ind. Const. art. 1, § 18. This argument has been considered and rejected by our court, both shortly after the enactment of our constitution, *Driskill v. State* (1855), 7 Ind. 338, 342, *Rice v. State* (1855), 7 Ind. 332, 338, and more recently in *Fleenor v. State* (1987), 514 N.E.2d 80, 90, *reh'g denied, cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). We reaffirm those holdings.

#### c. *Electrocution.*

 Defendant argues that even if the death penalty is not unconstitutional *per se*, it is cruel and unusual as applied in Indiana because of the nature of electrocution. Defendant cites the graphic opinion of former United States Supreme Court Justice William Brennan in *Glass v. Louisiana, cert. denied*, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (Brennan, J., dissenting)

and contends that "in an age which offers the alternative of lethal injection, the barbaric killing of people in 1993 by putting them in an antiquated electrical device should be considered no less cruel and unusual than burning at the stake or breaking on the wheel was considered to be in 1890." Br. of Appellant at 35. While we recognize the strong national trend toward lethal injection as the most appropriate form of capital punishment,[27] defendant's argument here does not persuade us to overrule our prior holdings that execution of a death sentence by electrocution does not violate the Eighth Amendment of the United States Constitution or Article 1, § 16, of the Indiana Constitution. *See Fleenor*, 514 N.E.2d at 89.

#### d. *Prosecutorial Discretion.*

 Defendant argues that the Indiana death penalty statute is unconstitutional because the prosecuting attorney is given overbroad and unfettered discretion in seeking the death penalty. This court has frequently rejected this contention, most recently in *Bivins v. State*, 642 N.E.2d 928, 947–48 (Ind. 1994).

#### e. *Consideration of Aggravating and Mitigating Circumstances.*

 Defendant attacks the Indiana death penalty statute's provisions concerning aggravating and mitigating circumstances in several respects. First, defendant contends the statute is constitutionally infirm "because it does not require the jury to consider all proffered and mitigating evidence, while it precludes consideration of relevant mitigation." Br. of Appellant at 36. We disagree with defendant's characterization of the statute. Indiana Code § 35–50–2–9(c)(8) (1988) specifically authorizes the jury to consider "any other circumstances appropriate for consideration" for mitigation. Furthermore, defendant has not identified any mitigating evidence that the jury was precluded from considering. Similarly, while defendant contends that the statute does not permit the death sentence to be imposed based upon non-statutory aggravating circumstances, he

---

27. *See, e.g.,* Lonny J. Hoffman, Note, 70 Tex. L.Rev. 1039, 1039 n. 5 (1992).

has not identified any non-statutory aggravating evidence which was presented to the jury.

 Defendant next contends that the death penalty statute is unconstitutional because "it does not require that the jury ... make a unanimous finding that each charged aggravator has been proven beyond a reasonable doubt, but does require a unanimous finding of mitigation before it may be weighed against aggravation." Br. of Appellant at 36. Defendant's claim here relates to the problem identified by the United States Supreme Court in *Mills v. Maryland,* 486 U.S. 367, 374, 108 S.Ct. 1860, 1865, 100 L.Ed.2d 384 (1988). If a jury is required to be unanimous in finding that a particular mitigating circumstance exists before that circumstance can be weighed against any aggravating circumstances found, then in theory, while all twelve jurors might agree that some mitigating circumstances were present (and even agree that those mitigating circumstances were significant enough to outweigh any aggravating circumstances found), unless all twelve could agree that the *same* mitigating circumstance was present, they would never be permitted to engage in the weighing process or any deliberation on the appropriateness of the death penalty. *Id.* Death penalty schemes requiring such unanimity were held unconstitutional in *Mills* and *McKoy v. North Carolina,* 494 U.S. 433, 439–44, 110 S.Ct. 1227, 1231–32, 108 L.Ed.2d 369 (1990).[28] We do not believe Indiana's death penalty statute is subject to these infirmities. First, there is no language in our statute or case law that suggests jury unanimity is required on a mitigating circumstance before it can be weighed against any

aggravating circumstances that can be properly found, and we hold that such unanimity is not required. Indeed, as we said in *Bivins,* "Indiana procedure provides for jury consideration of any mitigating factor, enumerated or not, without reference to unanimity. Thus, the Indiana procedure does not run afoul of *Mills.*" *Bivins,* 642 N.E.2d at 947. Second, there is no contention, and our review of the record does not suggest, that the trial court instructed the jury that unanimity was required.

 Lastly, defendant argues that the statute is constitutionally defective because it does not place the burden of proving that aggravating circumstances outweigh mitigating circumstances on the State, thus shifting that burden of proof to the defendant in violation of *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and because it does not provide any guidance as to the method and level of proof required for determining if aggravating circumstances sufficiently outweigh mitigating circumstances. We have previously held that our statute does not shift the factual burden of proof in violation of the Eighth and Fourteenth Amendments, *Bivins,* 642 N.E.2d at 945–46, and decline to revisit the issue here. We have further held that "when a jury makes its ultimate determination of whether to recommend the death penalty, it need only find that the aggravating circumstances *outweigh* the mitigating circumstances; the jury is not required to reach this conclusion *beyond a reasonable doubt.*" *Rouster v. State* (1992), Ind., 600 N.E.2d 1342, 1348, *reh'g denied* (emphasis in the original) (citing *Daniels v. State* (1983), Ind., 453 N.E.2d 160, 171, *denial of post-conviction relief aff'd* (1988),

---

**28.** The Maryland statute at issue in *Mills* and the North Carolina statute at issue in *McKoy,* though somewhat different from one another, both provided for sentencing by jury, and both provided that juries were required to answer specific questions about any mitigating circumstances found on written verdict forms. In Indiana, sentencing is by judge, not jury, Ind.Code § 35–50–2–9(e) (1988), and we do not use special verdicts or interrogatories to the jury. Ind.Trial Rule 49. Thus, the applicability of *McKoy* and *Mills* to death penalty jurisprudence in Indiana is attenuated at best.

Defendant urges that our statute is unconstitutional for not requiring such written findings as

to particular aggravating and mitigating circumstances found and considered on the theory that the judge must give the jury's decision great weight in passing sentence on the defendant. Br. of Appellant at 37. We reject this argument. While the trial court must consider the jury's recommendation and its sentence must be based on the same standards that the jury was required to consider, we perceive nothing of a constitutional dimension that would require the trial court to have the details of the jury's deliberations before it in discharging these statutory obligations.

Ind., 528 N.E.2d 775, *reh'g denied, cert. granted, judgment vacated, and remanded,* 491 U.S. 902, 109 S.Ct. 3182, 105 L.Ed.2d 691 (1989), *after remand* (1990), Ind., 561 N.E.2d 487 (affirming denial of post-conviction relief)). This standard provides sufficient guidance for the jury to engage in the weighing required by the statute. We have repeatedly affirmed the constitutionality of this standard, most recently in *Bivins,* 642 N.E.2d at 945–46.

f. *Meaningful Appellate Review.*

■ Defendant contends that our death penalty statute violates the Eighth and Fourteenth Amendments of the United States Constitution by failing to provide for a meaningful appellate review of defendant's conviction and sentence. Again, we have repeatedly rejected the contention that our statutory death penalty procedure for its constitutionally inadequate appellate review, most recently in *Bivins,* 642 N.E.2d at 948.

*Death Sentence Review*

The Indiana Constitution provides that "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to review and revise the sentence imposed." Ind. Const. art. 7, § 4. Although our rules for appellate review of sentences require that great deference be given to the judgment of the trial court, *e.g.,* Ind.Appellate Rule 17, where the sentence is death, those rules "stand more as guideposts for our appellate review than as immovable pillars supporting a sentence decision." *Spranger v. State* (1986), Ind., 498 N.E.2d 931, 947 n. 2, *reh'g denied* (1986), Ind., 500 N.E.2d 1170, *cert. denied,* 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987). In fact, we have made it clear that "this Court's review of capital cases under Article 7 is part and parcel of the sentencing process." *Cooper v. State* (1989), Ind., 540 N.E.2d 1216, 1218.

This special review of death sentences is grounded in the Indiana Constitution, our state's death penalty statute, and federal death penalty jurisprudence. Our constitution provides that appeals from judgments imposing a death sentence are to be brought directly to this court. Ind. Const. art. 7, § 4.

Indiana Code § 35–50–2–9(h) (1988) specifies that a death sentence is subject to automatic review by this court, is to be given priority over all other cases, and that a death sentence is not to be carried out until this court has completed completed its review.

It is understandable that both our Constitution and legislature should require such special appellate scrutiny of death sentences because so many of the fundamental values embodied in our state Bill of Rights are at stake in death penalty cases. *See, e.g.,* Ind. Const. art. 1, § 1 (life is an inalienable right); Ind. Const. art. 1, § 16 (cruel and unusual punishment shall not be inflicted; all penalties shall be proportioned to the nature of the offense); and Ind. Const. art. 1, § 18 (penal code shall be founded on principles of reformation and not vindictive justice).

The special role of this court in reviewing death sentences is also grounded in federal death penalty jurisprudence. In general, the United States Supreme Court "has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'" *Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985) (quoting *California v. Raimos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983)). Meaningful appellate review of death sentences plays a crucial role in ensuring that the death penalty is not imposed arbitrarily or irrationally. *Parker v. Dugger,* 498 U.S. 308, 321, 111 S.Ct. 731, 739–40, 112 L.Ed.2d 812 (1991); *Gregg,* 428 U.S. at 204–06, 96 S.Ct. at 2939–41.

*Penalty Phase.*

Our death penalty statute guides our review of death sentences by setting forth standards governing trial court imposition of death sentences. Following completion of the guilt phase of the trial and the rendering of the jury's verdict, the trial court reconvenes for the penalty phase. The State must prove at least one aggravating circumstance beyond a reasonable doubt. The defendant has the opportunity to present any additional evidence relevant to the aggravating circum-

stances alleged and to any mitigating circumstances. Ind.Code § 35–50–9–2(d) (1988).

■ As part of the State's presentation of evidence during this penalty phase of the trial, the State presented evidence of defendant's prior conviction for murder and the ages of Tia Forsee and Jordan Hanmore. Over objection by the defendant, the trial court also permitted an uncle of Stacy Forsee to read a seven-sentence statement to the jury relating the impact that the murders had on his family and, referring to defendant's previous convictions, concluding that "we must allow and enforce the death penalty in cases such as these."

■ Defendant argues that this statement was irrelevant to the jury's sentencing recommendation in that it did not provide any helpful information as to the culpability of the defendant, his personal characteristics, or the circumstances of the crime. Further, defendant argues that the statement was not as much a "victim impact" statement as it was an opinion that the death penalty should be imposed. Allowing such statements, defendant contends, "encourages random and arbitrary death penalty recommendations based on victim status." [29] Br. of Appellant at 27.

In the recent *Bivins* case, we held that "the admissibility of victim impact evidence depends upon its relevance to the death penalty statute's aggravating and mitigating circumstances." *Bivins,* 642 N.E.2d at 957. As in *Bivins,* the victim impact evidence here was improper both because of its lack of relevance to the charged aggravating circumstances and the mitigating circumstances asserted by the defendant. However, the victim impact evidence presented was extremely brief and not likely to have influenced jury. Furthermore, the prosecutor did not refer to the statement in closing argument. We find the admission of such evidence to be harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17

L.Ed.2d 705 (1967); *Rabadi v. State* (1989), Ind., 541 N.E.2d 271, 276. *Cf. Bivins,* 642 N.E.2d at 957.

Following presentation of the State's evidence at the penalty phase, the defendant introduced his military record into evidence as a mitigating circumstance. Following closing arguments of counsel, the jury unanimously recommended that the death penalty be imposed.

*Trial Court Sentencing Determination.*

Once the jury has made its recommendation, the jury is dismissed, and the trial court has the duty of making the final sentencing determination. First, the trial court must find that the State has proved beyond a reasonable doubt that at least one of the aggravating circumstances listed in the death penalty statute exists. Ind.Code § 35–50–2–9(e)(1) (1988) (currently Ind.Code § 35–50–2–9(i)(1) (1993)). Second, the trial court must find that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. Ind.Code § 35–50–2–9(e)(2) (1988) (currently Ind.Code § 35–50–2–9(i)(2) (1993)). Third, before making the final determination of the sentence, the trial court must consider the jury's recommendation. Ind.Code § 35–50–2–9(e) (1988). However, the court is not bound by the jury's recommendation. *Id.* The trial court must make a record of its reasons for selecting the sentence that it imposes. Ind. Code § 35–38–1–3 (1988).

■ These statutory provisions make clear that the sentencing court has a separate and independent role in assessing and weighing the aggravating and mitigating circumstances and in making the final determination whether to impose the death penalty. *Benirschke v. State* (1991), Ind., 577 N.E.2d 576, 579, *reh'g denied* (1991), Ind., 582 N.E.2d 355, *cert. denied,* —— U.S. ——, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). In arriving at its own separate determination as to whether the death penalty is an appropriate

---

**29.** Defendant also argues that the General Assembly has indicated that it considers victim impact evidence inadmissible in capital cases. It draws this conclusion from Ind.Code § 35–38–1–8.5(a) (1991 Supp.), which requires a victim impact statement in all presentencing reports except capital cases. We do not agree. The statute in no way precludes victim impact statements in presentence reports in capital cases; it only makes them optional. *See Bivins,* 642 N.E.2d at 960 (Sullivan, J., concurring in part and concurring in result).

punishment, the sentencing court is to point out its employment of this process in specific and clear findings. *Id.*

The requirement for sentencing findings are more stringent in capital cases than in non-capital sentencing situations. *Evans v. State* (1990), Ind., 563 N.E.2d 1251, 1254, *reh'g granted on other grounds* (1992), Ind., 598 N.E.2d 516, *reh'g denied.* The trial court's statement of reasons (i) must identify each mitigating and aggravating circumstance found, (ii) must include the specific facts and reasons which lead the court to find the existence of each such circumstance, (iii) must articulate that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence, *Benirschke,* 577 N.E.2d at 579, *Evans,* 563 N.E.2d at 1254, and (iv) must set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime. *Benirschke,* 577 N.E.2d at 579; *Woods,* 547 N.E.2d at 793.

We require such specificity in a sentencing order or statement of reasons for imposing a sentence to insure the trial court considered only proper matters when imposing sentence, thus safeguarding against the imposition of sentences which are arbitrary or capricious, and to enable the appellate court to determine the reasonableness of the sentence imposed. *Daniels v. State* (1990), Ind., 561 N.E.2d 487, 491.

The trial court's sentencing order reads as follows:

### SENTENCING ORDER

#### (December 14, 1991)

The State of Indiana appears by Prosecuting Attorney Kimberly Kelley Mohr and Chief Deputy Prosecuting Attorney W. Trent VanHaaften, and the Defendant appears in person, in custody of the Posey County Sheriff's Department, and by counsel, Ronald Warrum and Thomas M. Swain. The Defendant having been convicted on November 14, 1991 of Count I, Arson, a Class A Felony, Count III, Murder, and Count IV, Murder, and for being a Habitual Offender, the Cause proceeds to sentencing hearing.

After considering the testimony presented in open Court this date, the arguments of counsel, the pre-sentence report and the psychological evaluation submitted by Dr. Thomas Liffick, the Court FINDS:

### I.

### FINDINGS

As to Count I, Arson, a Class A Felony, the aggravating circumstances and mitigating circumstances do not outweigh one another as to require a sentence greater or less than the presumptive sentence;

The sentence imposed on Count I should be enhanced by an additional thirty years for being a Habitual Offender.

The State of Indiana having sought the death penalty in this cause as to Counts III and IV, and the Jury having recommended the death penalty, the Court has considered the following aggravating factors as to Counts III and IV:

James P. Harrison committed the murder by intentionally killing the victim, Jordan Hanmore, while committing or attempting to commit Arson;

James P. Harrison has been convicted of another murder, to-wit: Murder of Denise T. Wilberger on June 22, 1973, Cause No. A63256, Circuit Court of Arlington County, Virginia; and

The victims of the murders, Tia Forsee and Jordan Hanmore, were both under twelve years of age, to-wit: Tia Forsee was 3 and ½ years old, and Jordan Hanmore was 21 months old.

The only factors the Court determines are mitigating are the fact that the Defendant served in the military in Vietnam and was wounded while in service to his country, and that Mr. Harrison suffered emotional, physical and sexual abuse as a child; and

The aggravating circumstances as to Counts III and IV far outweigh any mitigating circumstances requiring the Court to impose a sentence greater than the pre-

sumptive sentence, and allowing the Court to impose the death penalty.

## II.

### SENTENCE

The Court sentences the Defendant, James P. Harrison, as follows:

 . . . .

On Counts III and IV, Murder, James P. Harrison is sentenced to death.

The Defendant is remanded to the custody of the Posey County Sheriff's Department and he shall be transported forthwith to a facility designated by the Indiana Department of Correction, where inmates sentenced to die are held.

An execution date is not set at this time pending the appellate process.

We find that the foregoing sentencing order is insufficient. The order does not comply with Indiana Code § 35–50–2–9(e) (1988) and our precedents governing sentencing statements in capital cases in at least the following respects. First, the order does not set forth specific facts and reasons which lead the court to find the existence of each aggravating and mitigating circumstance. In fact, there is no explicit finding in the order that any aggravating circumstances exists;

the order only indicates that the trial court "considered" the aggravating circumstances set forth.[30] Second, the order does not establish that the trial court found that the State proved beyond a reasonable doubt that at least one aggravating circumstance exists. Third, there is nothing in the sentencing order indicating that the trial court considered the jury's recommendation; the order only acknowledges that the jury "recommended the death penalty." Fourth, the order does not contain the personal conclusion of the trial court that death is the appropriate punishment for this offender and this crime; the order only observes that aggravating circumstances "far outweigh any mitigating circumstances ... allowing the Court to impose the death penalty."

While the sentencing order is clearly insufficient to permit us to give the death sentence here the meaningful appellate review required, we also recognize that the trial court conducted an extensive sentencing hearing in which the trial court appears to have recited on the record many of the findings that we require to be included in the written sentencing order. While there is some rational basis for simply incorporating the trial court's oral statements at the sentencing hearing into its sentencing order, in

---

**30.** We are particularly troubled by the trial court's listing of the aggravating circumstance that the defendant intentionally killed Jordan Hanmore. Although there is some inconsistency among the charging instrument, the preliminary instructions, and the final instructions, the parties appear to agree that defendant was charged with and convicted of the felony murder of Jordan Hanmore. See Br. of Appellee at 14. Thus, that the killing was intentional, which is required to support this aggravating circumstance, was not established by the jury's verdict during the guilt phase. (We discussed the required *mes rea* for felony murder in another context above under "Issues on Appeal—1. Inconsistent Verdicts.") The State had the burden of proving beyond a reasonable doubt during the sentencing phase that the killing by arson was intentional if this aggravating circumstance was to be used to support a sentence of death. From a careful reading of the transcript of the trial court's comments during the sentencing hearing, it appears to us that the trial court made no distinction between felony murder and intentional killing for this purpose:

> There are separate factors which the legislature says that the Judge has to consider on the

death penalty. Indiana Code § 35–50–2–9. And they are as follows. The Defendant committed the murder or murders by intentionally killing the victim while committing or attempting to commit any of the following: A. Arson. Now, you were only charged with killing Jordan Hanmore by arson. And that is all that I have considered as to these Counts III and IV. But you were charged with that by the State and, of course, it has been proved to beyond any reasonable doubt that you did kill Jordan Hanmore by arson.

> . . . .
> In order to impose the death penalty the Judge has to find that at least one of the aggravating circumstances has been proven beyond a reasonable doubt. . . . As to Jordan in Count IV, ... [t]he State also alleged that you killed Jordan Hanmore during the commission of an arson which, of course, you did and they proved that beyond a reasonable doubt.

Given this record, a far more detailed explanation is required to support a finding that the defendant intentionally killed Jordan Hanmore.

the end we believe we must "stand firm and require a clear demonstration that the essential operations of the death sentencing process have taken place." *Dillon v. State* (1983), Ind., 454 N.E.2d 845, 856 (DeBruler, J., concurring and dissenting), *cert. denied,* 465 U.S. 1109, 104 S.Ct. 1617, 80 L.Ed.2d 145 (1984), *writ of habeas corpus granted, Dillon v. Duckworth,* 751 F.2d 895 (7th Cir.1985), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). We find this situation to be similar to that in *Judy v. State* (1981), 275 Ind. 145, 416 N.E.2d 95, and *Benirschke.* In *Judy,* the sentencing court had set forth at the sentencing hearing the evidence of mitigating circumstances into discrete categories and then simply did not recite them in its written findings. We remanded for an inclusion of such acts of judgment in the sentencing order. 275 Ind. at 173, 416 N.E.2d at 110–11. In *Benirschke,* we determined that the trial court had not clearly set out its findings that it had made the independent judgments required and had not sufficiently indicated the evaluation given to mitigating circumstances. As in *Judy,* we ordered the trial court to articulate more specifically its findings in these regards. *Benirschke,* 577 N.E.2d at 579.

### Conclusion

We affirm the convictions of defendant James P. Harrison for the knowing Murder of Tia Forsee and for the Felony Murder of Jordan Hanmore. For the reasons set forth above, we remand the case to the Posey Circuit Court for a more specific sentencing order or statement of reasons for selecting the sentence it imposed.

DeBRULER, GIVAN and DICKSON, JJ., concur.

SHEPARD, C.J., concurs in result with separate opinion.

SHEPARD, Chief Justice, concurring in result.

I join in all of the Court's opinion save for the declaration that the trial judge committed error by allowing Stacy Forsee's uncle to tell the jury about the impact of these grisly murders on the family. Indiana is not a

safer place, or a place of greater justice, by virtue of the Court's declaration that what such victims have to say is "irrelevant."